# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2018-NMSC-027

Filing Date: March 9, 2018

Docket No. S-1-SC-35657

JOEL IRA,

      Petitioner,

v.

JAMES JANECKA, Warden,
Lea County Correctional Facility,
Hobbs, New Mexico,

      Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Jerry H. Ritter, Jr., District Judge**

Gary C. Mitchell, P.C.
Gary C. Mitchell
Ruidoso, NM

for Petitioner

Hector H. Balderas, Attorney General
Laurie Pollard Blevins, Assistant Attorney General
Santa Fe, NM

for Respondent

Rory L. Rank
Las Cruces, NM

Juvenile Law Center
Marsha L. Levick
Philadelphia, PA

for Amicus Curiae Juvenile Law Center

1

CHÁVEZ, Justice.

{1}    During the last thirteen years the Supreme Court of the United States, relying on neuroscientific evidence of adolescent behavior, issued three opinions declaring that certain sentences imposed on juvenile offenders violate the Eighth Amendment prohibition of cruel and unusual punishment.  *Roper v. Simmons*, 543 U.S. 551 (2005) (prohibiting the imposition of the death penalty for a crime committed by a juvenile); *Graham v. Florida*, 560 U.S. 48 (2010) (holding that no juvenile could be sentenced to life without the possibility of parole for a nonhomicide offense); *Miller v. Alabama*, 567 U.S. 460 (2012) (striking down a statute that required courts to sentence a juvenile convicted of murder to life without parole).  These cases created a special category under the Eighth Amendment for juvenile offenders whose culpability is mitigated by adolescence and immaturity.  The cases recognize that a juvenile is more likely to be rehabilitated than an adult and therefore should receive a meaningful opportunity to obtain release by demonstrating maturity and rehabilitation.  In *Montgomery v. Louisiana*, ___ U.S. ___, ___, 136 S.Ct. 718, 736-37 (2016), the Supreme Court endorsed the principles in *Roper*, *Graham*, and *Miller* and held that *Miller* applies retroactively because it announced a substantive rule of constitutional law.

{2}    Nearly twenty years ago, Petitioner, Joel Ira, was sentenced as a juvenile to 91½ years in the New Mexico Department of Corrections after he pled no contest to several counts of criminal sexual penetration and intimidation of a witness—crimes which he committed when he was fourteen and fifteen years old.  Under the relevant Earned Meritorious Deduction Act (EMDA), NMSA 1978, § 33-2-34(A) (1988, amended 2015),[1] Ira can be eligible for parole when he has served one-half of his sentence—approximately 46 years—if he maintains good behavior while incarcerated.  He will be approximately 62 years old when he can first be eligible for parole.

{3}    Ira petitioned for a writ of habeas corpus to make the central argument that his sentence is equivalent to a life sentence without parole and therefore constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article II, Section 13 of the New Mexico Constitution.  He relies on *Roper* and its progeny for his argument.  Whether the rationale of these cases, and in particular *Graham*, should be applied to a term-of-years sentence for the commission of multiple crimes is the preliminary question we must answer.  If *Graham* applies, we must next consider whether

---

[1]Under the EMDA that applied when Ira was sentenced in 1997, an inmate "confined in the penitentiary of New Mexico . . . may be awarded a meritorious deduction of thirty days per month upon recommendation of the classification committee and approval of the warden . . . ."  NMSA 1978, § 33-2-34(A) (1988).  This statute effectively provides for a fifty percent reduction in an inmate's sentence if the inmate merits that reduction through good behavior while in confinement.

Ira's long consecutive sentence effectively deprives him of a meaningful opportunity to obtain release by demonstrating his maturity and rehabilitation, thereby violating the prohibition of cruel and unusual punishment.

**{4}**     Other courts are split on whether to apply *Graham* when a juvenile receives a a multiple term-of-years sentence for the commission of multiple crimes. We conclude that *Graham* applies when a multiple term-of-years sentence will in all likelihood keep a juvenile in prison for the rest of his or her life because the juvenile is deprived of a meaningful opportunity to obtain release by demonstrating his or her maturity and rehabilitation. In this case, Ira can be eligible for a parole hearing when he is 62 years old if he demonstrates good behavior under the EMDA. Therefore, based on the record before us, we conclude that Ira has a meaningful opportunity to obtain release by demonstrating his maturity and rehabilitation before the Parole Board. We find the remaining issues raised in the petition to be without merit and therefore deny the petition.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

**{5}**     The underlying conduct for which Ira pled no contest is discussed extensively in *State v. Ira*, 2002-NMCA-037, 132 N.M. 8, 43 P.3d 359. Ira pled no contest to ten counts of criminal sexual penetration, one count of aggravated battery (great bodily harm), one count of aggravated battery against a household member, and one count of intimidation of a witness. *Id.* ¶¶ 2, 4. Ira committed these crimes when he was fourteen and fifteen years old. *Id.* ¶ 2. The victim of Ira's criminal sexual penetration and intimidation of a witness offenses was his stepsister, who was six years younger than Ira. *Id.*

**{6}**     The district court had the discretion to invoke an adult sentence or a juvenile disposition. NMSA 1978, § 32A-2-20(A) (1996, amended 2009). The district court invoked an adult sentence because the court found that Ira was "not amenable to treatment or rehabilitation as a child in available facilities," and Ira was "not eligible for commitment to an institution for the developmentally disabled or mentally disordered." Section 32A-2-20(B)(1)-(2). The district court made these findings persuaded by the seriousness of the crimes and the effect on the young victim. The district court also noted that although Ira's lifestyle "was not one to be envied," the experts testified that Ira was "devoid of conscience and devoid of empathy for other human beings." The district court ultimately sentenced Ira to 91½ years in the custody of the New Mexico Department of Corrections.

**{7}**     The Court of Appeals affirmed, holding that his sentence was not cruel and unusual punishment. *Ira*, 2002-NMCA-037, ¶ 1. The Court compared the gravity of Ira's offense against the severity of his sentence to determine whether the punishment was grossly disproportionate to the offense. *Id.* ¶ 19. It considered the severity of Ira's conduct, the toll of that conduct on his victim, and his lack of remorse and likelihood of committing similar acts in the future. *Id.* In light of these facts, the Court of Appeals decided his sentence was not "grossly disproportionate as to shock the general conscience or violate principles of fundamental fairness." *Id.* It acknowledged that "the decision to sentence a child as an adult

3

is an extreme sanction that cannot be undertaken lightly." *Id.* ¶ 20. Yet, it emphasized that "the imposition of a lengthy, adult sentence on a juvenile does not, in itself, amount to cruel and unusual punishment." *Id.*

**{8}** In his special concurrence, Chief Judge Bosson expressed concern over the length of Ira's sentence. Since the earliest Ira can be eligible for a parole hearing is after serving 45 years of his sentence, Chief Judge Bosson noted, "[f]or one so young, this is effectively a life sentence. One who goes into prison a teenager and comes out a man at the age of retirement has forfeited most of his life." *Id.* ¶ 45 (Bosson, C.J., specially concurring).

**{9}** Chief Judge Bosson also observed the irony of the sentence when compared with the underlying offenses for which Ira pled no contest, explaining that

> [i]f [Ira] had eventually killed his victim, perhaps to protect himself from prosecution for his other crimes, he could have received a life sentence as an adult, but would have become eligible for parole after a "mere" thirty years. Thus, although [he] commits crimes which, however gruesome, are less than first degree murder, he receives a sentence that is effectively fifty percent longer.

*Id.* ¶ 46.

**{10}** Ira filed a writ of habeas corpus in the district court that sentenced him pursuant to Rule 5-802 NMRA. In it he argued that (1) his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment and Article II, Section 13 of the New Mexico Constitution; (2) the trial court erred in failing to set aside his plea agreement; and (3) he was denied effective assistance of counsel. The district court denied his petition. We granted certiorari pursuant to Rule 12-501 NMRA.

## II.    DISCUSSION

### A.    The Eighth Amendment Forbids a Term-of-Years Sentence That Deprives a Juvenile of a Meaningful Opportunity to Obtain Release

**{11}** Ira's argument that his 91½-year sentence is cruel and unusual punishment in violation of the Eighth Amendment and Section II, Article 13 of the New Mexico Constitution is a question of constitutional law, which we review de novo. *See State v. DeGraff*, 2006-NMSC-011, ¶ 6, 139 N.M. 211, 131 P.3d 61. We do not address the prohibition of cruel and unusual punishment under Section II, Article 13 because we conclude that the Eighth Amendment affords the necessary protection in this case. *See State v. Gomez*, 1997-NMSC-006, ¶ 19, 122 N.M. 777, 932 P.2d 1 (holding that when an asserted right is protected under the United States Constitution, the claim under the New Mexico Constitution is not reached).

4

**{12}** The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The United States Supreme Court looks beyond a historical interpretation of cruel and unusual punishment and instead looks to "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion). The Court emphasizes that "[e]mbodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" *Graham*, 560 U.S. at 59 (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). The Eighth Amendment "does not require strict proportionality between crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the crime." *Graham*, 560 U.S. at 59-60 (internal quotation marks and citation omitted). Some punishments are so grossly disproportionate that the Court has imposed "categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of the penalty." *Miller*, 567 U.S. at 470.

**{13}** The Supreme Court has imposed several categorical bans on juvenile sentencing. In *Roper*, the Court held that the Eighth Amendment bars the death penalty for an offender who committed his or her offense before the age of eighteen. 543 U.S. at 568. In *Graham*,[2] the Court held that the Eighth Amendment prohibits juvenile offenders from being sentenced to life without the possibility of parole for a nonhomicide offense. 560 U.S. at 74. In *Miller*, the Court held that the Eighth Amendment prohibits a State from imposing a mandatory sentence of life without parole for juvenile offenders. 567 U.S. at 470.

**{14}** The first issue we address is whether the analysis of juvenile sentencing in *Roper*, *Graham*, and *Miller* should be applied to multiple term-of-years sentences. Some jurisdictions have held that these cases do not reach multiple term-of-years sentences for multiple non-homicide crimes. *See State v. Kasic*, 265 P.3d 410, 411, 415-16 (Ariz. Ct. App. 2011) (holding that "*Graham* does not categorically bar the sentence[] imposed" on a juvenile offender convicted of "thirty-two felonies arising from six arsons and one attempted arson committed over a one-year period beginning when he was seventeen years of age"); *State v. Brown*, 118 So. 3d 332, 341 (La. 2013) (observing that *Graham* did not include any "analysis of sentences for multiple convictions and provide[d] no guidance on how to handle such sentences"); *Vasquez v. Commw.*, 781 S.E.2d 920, 925 (Va. 2016) (holding that *Graham* is not implicated for "multiple term-of-years sentences imposed on multiple crimes that, by virtue of the accumulation, exceed[] the criminal defendant's life expectancy"); *Lucero v. People*, 2017 CO 49, ¶ 19 ("Multiple sentences imposed for multiple offenses do not become a sentence of life without parole, even though they may result in a lengthy term

---

[2]Graham was arrested and plead guilty to armed burglary with assault or battery and attempted armed robbery. *Id.* at 53-54. The court withheld adjudication of guilt as to both charges and sentenced Graham to concurrent 3-year terms of probation. *Id.* at 54. While still on probation, Graham participated in a successful home invasion and robbery, an attempted robbery, and a high speed police chase. *Id.* at 54-55.

of incarceration.”).

**{15}** Other jurisdictions reject the narrow interpretation espoused by these aforementioned courts, largely concluding that such a narrow interpretation is inconsistent with *Graham*'s requirement that a juvenile be given a meaningful opportunity for release based on the juvenile's demonstrated maturity and rehabilitation. In *Henry v. State*, 175 So. 3d 675, 676 (Fla. 2015), the Florida Supreme Court considered whether *Graham* governed a juvenile offender's challenge to his 90-year aggregate sentence for his convictions of sexual battery while possessing a weapon, robbery, kidnapping, carjacking, burglary, and possession of marijuana. The *Henry* court applied *Graham* to the sentence reasoning that "the *Graham* Court had no intention of limiting its new categorical rule to sentences denominated under the exclusive term 'life in prison.'" *Id.* at 680. The Court emphasized that the differences noted in *Graham* between a juvenile and an adult, which called into question the constitutionality of a life-without-parole sentence, provide an equally compelling reason to question the constitutionality of lengthy term-of-years sentences. *Id.* And just as the *Graham* Court held that life-without-parole sentences are not justified by penological theories, 560 U.S. at 71-75, the *Henry* court held that lengthy term-of-years sentences are not justified by the penological theory of rehabilitation, which provides the "only . . . valid constitutional basis for sentencing juvenile nonhomicide offenders." 175 So. 3d at 679, 680.

**{16}** Other jurisdictions applying *Graham* to term-of-years sentences offer different rationales for doing so. *See State v. Boston*, 363 P.3d 453, 457 (Nev. 2015) (permitting courts to sentence a juvenile non-homicide offender "undermine[s] the [Supreme] Court's goal of 'prohibit[ing] States from making the judgment at the outset that those offenders never will be fit to reenter society'") (third alteration in original) (quoting *Graham*, 560 U.S. at 75); *State v. Zuber*, 152 A.3d 197, 211 (N.J. 2017) (reasoning that there is no practical difference between a juvenile who receives life without parole and a juvenile who receives "multiple term-of-years sentences that, in all likelihood, will keep him in jail for the rest of his life"); *Budder v. Addison*, 851 F.3d 1047, 1053 n.4 (10th Cir. 2017) (interpreting *Graham* to include "*any* sentence that would deny a juvenile nonhomicide offender a realistic opportunity to obtain release, regardless of the label a state places on that sentence").

**{17}** Some jurisdictions have applied *Graham* when the sentence may provide for release before the juvenile's death but forecloses the opportunity for the juvenile to have a meaningful life outside of prison. *See State v. Moore*, 2016-Ohio-8288, 76 N.E.3d 1127, *cert. denied*, *Ohio v. Moore*, ___ U.S. ___, ___, 138 S. Ct. 62 (2017) (determining that a sentence that allows juvenile offenders to "breathe their last breaths" outside the prison walls is not the "meaningful opportunity" envisioned by the *Graham* Court). The Supreme Court of Connecticut articulated the same concern:

> A juvenile offender is typically put behind bars before he has had the chance to exercise the rights and responsibilities of adulthood, such as establishing a career, marrying, raising a family, or voting. Even assuming

6

the juvenile offender does live to be released, after a half century of incarceration, he will have irreparably lost the opportunity to engage meaningfully in many of these activities and will be left with seriously diminished prospects for his quality of life for the few years he has left. A juvenile offender's release when he is in his late sixties comes at an age when the law presumes that he no longer has productive employment prospects.

\* \* \*

The United States Supreme Court viewed the concept of "life" in *Miller* and *Graham* more broadly than biological survival; it implicitly endorsed the notion that an individual is effectively incarcerated for "life" if he will have no opportunity to truly reenter society or have any meaningful life outside of prison.

*Casiano v. Comm'r of Corr.*, 115 A.3d 1031, 1046, 1047 (Conn. 2015).

{18}    Some courts have held that the Eighth Amendment only requires courts to consider the constitutionality of each individual sentence as opposed to the cumulative impact of consecutive sentences, *see e.g. Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001).  Other courts disagree particularly when the consecutive sentences involve juvenile offenders.  *See Moore*, 2016-Ohio-8288, ¶ 73 ("Whether the sentence is the product of a discrete offense or multiple offenses, the fact remains that it was a juvenile who committed the one offense or several offenses and who has diminished moral culpability."); *Budder v. Addison*, 851 F.3d 1047, 1058 (10th Cir. 2017), *cert. denied sub nom. Byrd v. Budder*, ___ U.S. ___, ___, 138 S. Ct. 475 (2017) ("Just as [states] may not sentence juvenile nonhomicide offenders to 100 years instead of 'life,' they may not take a single offense and slice it into multiple sub offenses in order to avoid *Graham*'s rule that juvenile offenders who do not commit homicide may not be sentenced to life without the possibility of parole.").  The United States Supreme Court has not endorsed either view. *See State v. Buchhold,* 2007 SD 15, ¶ 30, 727 N.W.2d 816 (2007) (stating that the Supreme Court has not "provided a clear answer to [the] question" of whether the Eight Amendment proportionality review should be "confined to the sentences imposed for each individual conviction or whether it extends to the consecutive sentencing scheme."). *O'Neil v. State of Vermont*, 144 U.S. 323, 331 (1892), does not indicate anything about the Supreme Court's view on the matter.  The language quoted by the dissent in this case at paragraph 53 from *O'Neil* is not a holding of the Supreme Court but is only a quote from the lower court's opinion that the Supreme Court included for context. *O'Neil*, 144 U.S. at 331.  We are persuaded by the Supreme Court's rationale in *Roper*, *Graham*, and *Miller* that the cumulative impact of consecutive sentences on a juvenile is required by the Eighth Amendment.

{19}    The dissent would also limit the scope of *Graham* on the grounds that there is a significant distinction between life without parole sentences and term-of-years sentences. Diss. Op. ¶ 44.  The only difference our cases have recognized is that a life sentence, unlike

a term of years, lacks a discernable maximum and minimum term of imprisonment. *State v. Juan*, 2010-NMSC-041, ¶ 40, 148 N.M. 747, 242 P.3d 314. Although there is a distinction, the distinction is immaterial to an Eighth Amendment analysis under *Graham*. The *Graham* Court explained what makes a life without parole sentence severe enough to warrant the imposition of additional safeguards is the fact that the sentence "alters the offender's life by a forfeiture that is irrevocable." *Graham*, 560 U.S. at 69. Similarly, a term-of-years sentence that exceeds the juvenile's life expectancy "means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the juvenile], he will remain in prison for the rest of his days." *Id.* at 70 (internal quotation marks and citation omitted). The *Graham* Court recognized that in some cases "there will be negligible difference between life without parole and other sentences of imprisonment," citing the hypothetical of a 65-year-old who is sentenced to a lengthy term-of-years sentence without eligibility for parole as an example of a sentence that would be the functional equivalent of life without parole sentence. *Id.* at 70-71.

**{20}**    We conclude that the analysis contained within *Roper* and its progeny should be applied to a multiple term-of-years sentence. Taken together, *Roper*, *Graham*, and *Miller* reveal the following three themes regarding the constitutionality of juvenile sentencing.

**{21}**    First, juveniles' developmental immaturity makes them less culpable than adults because juveniles have an "underdeveloped sense of responsibility," and an inability "to appreciate risks and consequences," meaning juveniles' violations are likely to be a product of "transient rashness" rather than "evidence of irretrievabl[e] deprav[ity]." *Miller*, 567 U.S. at 471, 472, 477 (alterations in original) (internal quotation marks and citation omitted).

**{22}**    Second, juveniles have a greater potential to reform than do adult criminals which makes it essential that they have a meaningful opportunity to obtain release based on demonstrated maturity and reform. *Graham*, 560 U.S. at 75. Although the Eighth Amendment does not require a state to release juveniles during their natural lives, it prohibits states from making the judgment at the outset that juveniles will never be fit to reenter society. *Id.* The *Miller* Court emphasized that "none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific." 567 U.S. at 473. The *Graham* Court underscored that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." 560 U.S. at 73 (citing *Roper*, 543 U.S. at 572).

**{23}**    Third, no penological theory—retribution, deterrence, incapacitation, and rehabilitation—justifies imposing a sentence of life without parole on a juvenile convicted of a non-homicide crime because juveniles are less culpable and more amenable to reformation. *Graham*, 560 U.S. at 71-75.

**{24}**    With respect to retribution, the *Graham* Court explained that "[s]ociety is entitled to impose severe sanctions on a juvenile nonhomicide offender to express its condemnation of

8

the crime and to seek restoration of the moral imbalance caused by the offense." 550 U.S. at 71. "The heart of the retribution rationale," the Court reassured, focuses on "a criminal sentence [that] must be directly related to the personal culpability of the criminal offender." *Id.* (internal quotation marks and citation omitted). But in the case of juvenile offenders, the "case for retribution is not as strong . . . as with an adult," and "becomes even weaker with respect to a juvenile who did not commit homicide." *Id.* (internal quotation marks and citation omitted). Thus, retribution is not proportional if the state imposes life without parole on the less culpable juvenile nonhomicide offender. *Id.* at 71-72.

**{25}** Deterrence was similarly insufficient to justify a life without parole sentence on a juvenile. The *Graham* Court emphasized that "the same characteristics that render juveniles less culpable than adults suggest . . . that juveniles will be less susceptible to deterrence." *Id*. at 72. (internal quotation marks and citation omitted) (omission in original). A juvenile's "lack of maturity and underdeveloped sense of responsibility . . . often result in impetuous and ill-considered actions and decisions." *Id.* (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993) (omission in original)). As a result, juveniles are "less likely to take a possible punishment into consideration when making decisions." *Graham*, 560 U.S. at 72. Although a life without parole sentence may deter some juvenile offenders, "any limited deterrent effect provided by life without parole is not enough to justify the sentence." *Id.*

**{26}** Incapacitation also does not justify a life-without-parole sentence because a sentencing court would have to decide that a "juvenile offender forever will be a danger to society." *Id.* However, a sentencing court is not equipped to make such a judgment because, as the *Graham* Court explained, even expert psychologists encounter difficulty distinguishing between a crime that reflects on a juvenile's transient immaturity and a crime that reflects on a juvenile's irreparable corruption. *See id.* at 73.

**{27}** Rehabilitation does not support a life-without-parole sentence because it "forswears altogether the rehabilitative ideal." *Id.* at 74. The sentence reflects "an irrevocable judgment about [the juvenile offender's] value and place in society," a judgment that is inconsistent with a juvenile nonhomicide offender's "capacity for change and limited moral culpability." *Id.*

**{28}** Just as the *Graham* Court found no penological theory that justified the imposition of a life without parole sentence on a juvenile nonhomicide offender, we find no penological theory that supports a term-of-years sentence that in all likelihood will keep the juvenile in prison for the rest of his or her life without a meaningful opportunity to obtain release.

**{29}** What the *Graham* Court explained in establishing a bright-line rule prohibiting life without parole for a nonhomicide juvenile offender is that although "[a s]tate is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime," it must "give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75. The Court made clear that "[t]he Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide

9

crimes committed before adulthood will remain behind bars for life." *Id.* At the same time, the Eighth Amendment "does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society." *Id.*

{30}    In this case, the district court sentenced Ira to an adult prison, stating:

> Ordinarily, the young age of the defendant would tend to influence a judge toward leniency, based upon the inference that the crimes were motivated in part by youthful impulsiveness and immaturity, and that converting a large amount of incarceration to probation will allow the youth to show that the lesson has been learned and he can now benefit rather than attack society. That analysis does not apply here, first because of the inability to convert first degree felony incarceration to probation . . . and, second, because Joel Ira is not the typical young defendant. The evidence shows that he is almost certain to be the same threat to society upon his release as he is today because humanity has not developed a way to implant a conscience once the period for its natural growth has passed.

> * * *

> This Court would like to fashion a sentence that will guarantee, or even offer hope, that Joel Ira can be released after a period of time as a rehabilitated person, able to be a valuable part of, rather than a threat to, his community. There is no such sentence.

> This Court would like to fashion a sentence that will assure Joel Ira's victims that he will not be a serious threat to them if released before he reaches an advanced age. There is not such sentence.

> This Court must then fall back upon a sentence that will protect society from a man without a conscience until such time as his physical ability to cause harm is less than the likelihood that he would attempt it. To assure that result, in consideration of the crowded conditions of our prisons and the ability of the Department of Corrections to grant credit of up to half of an adult sentence in order to relieve overcrowding, the Court must impose twice what it intends to be the effective term of incarceration.

{31}    The district court relied on "the most experienced and qualified experts in the field of juvenile corrections and psychotherapy" at the time. These experts informed the court that Ira "is a child devoid of conscience and devoid of empathy for other human beings . . . . " The court further explained that

> [t]he experts say that each human being must develop these tools at a young age, for personalities become fixed before the teenage years and it is very

hard, if not impossible to implant a conscience in a sixteen year old where none existed before. These experts looked, in this case, for evidence of remorse or empathy that would provide the slightest glimmer of hope that Joel Ira could defy the odds and become rehabilitated, and they found none . . . . The experts told this Court that New Mexico simply does not have a program that offers even a slight hope of protecting the public if Joel Ira were released from custody.

**{32}** The court's sentiment that no hope existed for Ira to be rehabilitated because personalities become fixed before teenage years is of questionable neuroscientific validity since *Roper* and its progeny. There is no evidence in the record to assist this Court in determining whether indeed the experts' opinions were invalid and unreliable. The *Miller* Court assumed that juveniles as a category are immature, impetuous, and generally have a diminished capacity to avoid negative environmental influences and peer pressures. 567 U.S. at 471, 476. It held that these characteristics weigh in favor of mitigation, making the need for life sentences without parole uncommon. *Id.* at 479.

**{33}** The *Miller* Court recognized that some youths, despite their status as adolescents, may be different from the norm, and therefore declined to consider whether the Eighth Amendment requires a categorical ban on life without parole for juveniles. *Id.* Stated differently, the Supreme Court recognizes the need for individualized sentencing. Thus, the juvenile's attorney will introduce mitigating evidence, perhaps through a forensic mental health expert, that the juvenile conforms to developmental norms, which should dissuade the district court from imposing a sentence that in all likelihood will condemn the juvenile to prison for the rest of his or her life without a meaningful opportunity to obtain release. The prosecution will introduce evidence that the juvenile is not the norm and therefore the crime was not the product of transient developmental influences, but instead the evidence makes the juvenile that rare juvenile whose crime reflects irreparable corruption. *See id.* at 479-80.

**B.     Ira's Term-of-Years Sentence is Constitutional Because it Does Not Deprive Him of a Meaningful Opportunity to Obtain Release**

**{34}** Ira does not contest the evidence introduced against him during his sentencing or habeas corpus hearing. Instead he seeks a declaration that his sentence is categorically unconstitutional because it is the functional equivalent of a life sentence without the possibility of parole. Based on the record before us, we cannot agree with this contention.

**{35}** In this case the district court arguably found that Ira is that rare juvenile who is irreparably corrupt. Regardless, the sentence imposed on Ira does not deprive him of a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. Presuming that he demonstrates his good behavior, he will be parole eligible when he is approximately 62 years old. Had Ira been sentenced to 91½ years without the opportunity to reduce his sentence with good behavior, our analysis would be different. But, with demonstrated good behavior, Ira will have the opportunity to make his case before a parole

11

board.

{36}    The New Mexico Legislature enacted the Parole Board Act "to create a professional parole board." NMSA 1978, § 31-21-23 (1999).  This Act provides parole board members with extensive powers and duties in exercising their authority to grant or deny parole.  *See* NMSA 1978, § 31-21-25(B)(1), (2), (3) (2001) (providing that the parole board has the power to "conduct . . . investigations, examinations, interviews, hearings, and other proceedings . . .;" and to "summon witnesses, books, papers, reports, documents or tangible things and administer oaths as may be necessary for the effectual discharge of the duties of the board").  With respect to determining an inmate's eligibility for parole, NMSA 1978, Section 31-21-10(A)(2)(2009) requires the parole board to consider all pertinent information concerning the inmate, including:

> (a) the circumstances of the offense;
> (b) mitigating and aggravating circumstances;
> (c) whether a deadly weapon was used in the commission of the offense;
> (d) whether the inmate is a habitual offender;
> (e) the [presentence and prerelease] reports filed under [NMSA 1978, Section 31-21-9 (1972)]; and
> (f) the reports of such physical and mental examinations as have been made while in an institution[.]

Section 31-21-10(A)(2).

{37}    The parole board will be tasked with performing these duties during Ira's hearing to determine whether parole is in the best interest of society and whether Ira is able and willing to fulfill the obligations of a law-abiding citizen.  *See* NMSA 1978, § 31-21-10(A)(3), (4) (2007).  If he is granted parole, he will remain under the supervision of the parole board, possibly for the remainder of his life.  *See* § 31-21-10.1(A)(2) (providing that a person convicted of first-degree criminal sexual penetration shall serve a period of parole up to the person's natural life).

{38}    Certainly the fact that Ira will serve almost 46 years before he is given an opportunity to obtain release is the outer limit of what is constitutionally acceptable.  *See People v. Contreras*, 2018 WL 1042252, at *9-10, ___ P.3d ___ (Cal. 2018) (citing cases holding that 50-year-long sentences are the functional equivalent of life without parole, and citing legislation enacted in the wake of *Graham* requiring parole as soon as 15 years but no later than 40 years after the start of the juvenile's sentence).  The New Mexico Legislature is at liberty to enact legislation providing juveniles sentenced to lengthy term-of-years sentences with a shorter period of time to become eligible for a parole eligibility hearing.  At the time of Ira's sentencing, a defendant sentenced to life imprisonment in a New Mexico institution would have been eligible for parole after serving a thirty-year sentence. *See* § 31-21-10(A) (1997).  Whether the time frame in Section 31-21-10(A) or a shorter time frame is required by the Eighth Amendment to give juveniles a meaningful opportunity to obtain release

12

presents an important question that we cannot answer based on the evidentiary record before us. Some studies conclude that a juvenile's brain does not fully develop until early adult years. *See* Brief for the Am. Psychol. Ass'n, Am. Psychiatric Ass'n et al. as Amici Curiae Supporting Petitioners, at 27, *Graham*, 560 U.S. 48 (No. 08-7412) ("[T]he part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles."). Perhaps evaluating the juvenile's maturity and rehabilitation once the juvenile's brain has presumably developed is the time frame required by the Eighth Amendment, but *Roper* and its progeny are of no assistance to us, nor is the record in this case.

**{39}** Other jurisdictions, in the wake of *Graham,* have amended their parole eligibility time frames for juveniles. Nevada enacted such a statute in 2015 providing a juvenile offender with a parole eligibility hearing after serving fifteen years of incarceration if the juvenile was convicted of an offense that did not result in the death of a victim. *See* Nev. A.B. 267 (codified as N.R.S. 213.12135) (2015); Remarks by James Dold, Minutes of Nev. Assemb. Comm. on Jud. 7 (Mar. 27, 2015) ("In response to [*Roper*, *Graham*, and *Miller*] and the emerging juvenile brain and behavioral developmental science, several states across the country have begun to eliminate life without parole sentences for kids and create more age-appropriate and fair sentencing standards that are in line with A.B. 267."). Washington requires juvenile offenders to serve twenty years in confinement before petitioning for parole eligibility. *See* Wash. Rev. Code § 9.94A.730(1) (2015); *see also* La. Rev. Stat. § 15:574.4(D)(1)(A) (2017) (requiring juvenile offenders serving life imprisonment to serve at least twenty-five years before parole eligibility). California provides for parole eligibility after a juvenile offender serves fifteen years if the juvenile was younger than twenty-five years old when the juvenile committed the offense for which the juvenile received the longest sentence. *See* Cal. Penal Code § 3051(b)(1) (2018). The California legislature enacted this statute after the California Supreme Court interpreted *Graham* to apply to a juvenile nonhomicide offender sentenced to a term of 110 years to life. *See People v. Caballero*, 145 Cal. Rptr. 3d 286, 288 (2012). Although we consider Ira's opportunity to obtain release when he is 62 years old constitutionally meaningful, albeit the outer limit, we do not intend to discourage the legislature from adopting a shorter time period as have many other jurisdictions.

## C.  Ira's Remaining Claims Lack Merit

**{40}** Ira alleges a number of procedural errors at the district court. First, he asserts that his waiver of a preliminary hearing should not have been honored because preliminary hearings for children should not be allowed to be waived. At the time of the proceedings against Ira, Rule 10-222 NMRA governed the circumstances under which an alleged youthful offender was afforded a preliminary hearing. When Ira entered his plea, Rule 10-222 was silent about whether a child could waive a preliminary hearing. *See* Rule 10-222 NMRA (1995); *but see* N.M. Const. art. II, § 14 (recognizing that a person being held on a criminal information for a "capital, felonious, or infamous crime" may waive the right to a

13

preliminary examination). Rule 10-222 was amended while Ira's case was pending to explicitly permit such a waiver, and this right remains available today under Rule 10-213 NMRA. *See* Rule 10-222(B) (1999) ("[A] preliminary examination will be conducted unless the case is presented to a grand jury or the child waives the right to a preliminary hearing or grand jury."); Rule 10-213(B)(1) (2014). Accordingly, we find this argument to be without merit. Second, Ira contends that he did not have a separate amenability hearing. This issue is without merit because Ira did have both an amenability hearing and a separate sentencing hearing. Third, Ira contends that he did not receive a report from the Children, Youth and Families Department (CYFD) prior to the amenability hearing required by NMSA 1978, Section 32A-2-17(A)(3) (1995, amended 2009). This issue is without merit because the children's court attorney who prosecuted the case testified that a report was prepared, although it may not have been introduced into evidence. In addition, a CYFD juvenile probation officer testified during the amenability hearing and strongly urged the children's court judge to impose adult sanctions. Fourth, Ira asserts that once the court decided to impose an adult sanction he was entitled to a predisposition report from the adult probation and parole division of the Department of Corrections as required by Section 32A-2-17(A)(3)(b). The State concedes this point but contends that Ira was not prejudiced because expert witnesses testified that no rehabilitation programs in the adult prison system were available to treat Ira. We agree with the State that Ira has not shown prejudice. *See State v. Jose S.*, 2007-NMCA-146, ¶ 20, 142 N.M. 829, 171 P.3d 768 (holding that a child must show prejudice from the court's failure to follow the statutory requirements).

**{41}** The fifth issue raised by Ira requires more elaboration. Ira asserts that the district court erred in failing to set aside his plea agreement because neither he, his attorney, the prosecutor nor the judge understood the sentence that could be imposed on Ira and therefore the judge initially imposed an illegal sentence on Ira. Ira argued this issue before the district court and on appeal before the Court of Appeals. *See Ira*, 2002-NMCA-037, ¶¶ 11, 35, 36. In a memorandum opinion, the Court of Appeals reversed his sentence because the district court erred in imposing adult sanctions for the five counts of criminal sexual penetration Ira committed when he was fourteen years old. *See State v. Joel I.*, No. 18,915, mem. op. at 3, 5 (N.M. Ct. App. Oct. 1, 1998) (non-precedential). At the time Ira was fourteen years old, the New Mexico Children's Code provided that a child between fifteen and eighteen years old is a "youthful offender" subject to adult sanctions when the child is charged with at least one of ten enumerated offenses, including aggravated battery and criminal sexual penetration. *See* NMSA 1978, § 32A-2-3(I)(1)(d), (g) (1995, amended 1996). Because Ira was only fourteen years old when he committed five counts of criminal sexual penetration, the district court could not impose adult sanctions with respect to those five counts. After the Court of Appeals reversed Ira's sentence, the district court resentenced him as an adult for the remaining five counts of criminal sexual penetration committed when Ira was fifteen years old, which Ira is currently serving. The Court of Appeals also rejected the arguments that the district court should have allowed Ira to withdraw his plea because of the sentencing error and the alleged ineffective assistance of counsel. Ira has had a full and fair opportunity to argue the merits of these issues and we therefore exercise our discretion to give preclusive effect to these issues. *See Duncan v. Kerby*, 1993-NMSC-011, ¶ 6, 115 N.M. 344, 851 P.2d

466 (concluding that an appellate court may exercise discretion in giving preclusive effect to an ineffective assistance of counsel claim rejected on direct appeal and subsequently raised in a habeas corpus proceeding).

## III.   CONCLUSION

**{42}**   For the foregoing reasons, we affirm the district court's denial of Ira's habeas corpus petition.

**{43}   IT IS SO ORDERED.**

 

_____

**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Justice**

_____

**BARBARA J. VIGIL, Justice**

**JUDITH K. NAKAMURA, Chief Justice (dissent in part and concur in part)**

**PETRA JIMENEZ MAES, Justice (joining in dissent and concurrence)**

**NAKAMURA, Chief Justice (concurring in part, dissenting in part).**

**{44}**   The categorical rule announced in *Graham* precluding states from imposing a sentence of life without parole upon juveniles convicted of a nonhomicide offense does not extend to Joel Ira.  Ira perpetrated multiple nonhomicide offenses over a lengthy period of time and was sentenced to multiple term-of-years sentences to be served consecutively. *Ira*, 2002-NMCA-037, ¶ 14.  There is a meaningful distinction between juveniles sentenced to life without parole for the commission of a single offense and juveniles sentenced to multiple consecutive sentences for a series of offenses committed over a period of time.  This is amply illustrated by comparing Ira's case to *Commonwealth v. Donovan*, 662 N.E.2d 692 (Mass. 1996), a Massachusetts case involving a defendant who was sentenced as a juvenile to life without the possibility of parole for a single criminal act and who was paroled in the wake of *Graham* and *Miller*.  Although Donovan was convicted of a homicide offense, the comparison is still apt:  Donovan committed one offense, Ira committed multiple offenses.  As will become clear, this critical difference between Donovan's and Ira's cases should inform our reading of *Graham*.

**{45}**   Joseph Donovan was seventeen years old on the night of September 18, 1992. Joseph

15

Donovan, The Commonwealth of Massachusetts Executive Office of Public Safety, Parole Board Decision (Aug. 7, 2014) at 1-2.[3]  As Donovan and two companions walked down the street in Cambridge, Massachusetts, they encountered two men.  *Donovan*, 662 N.E.2d at 694.  The men were Norwegian citizens studying at the Massachusetts Institute of Technology, *id.*, a fact that assuredly contributed to the significant media attention dedicated to the events which unfolded during the chance encounter.  One of the two men "bumped into" Donovan and Donovan demanded an apology.  *Id.* at 695.  No apology was given and Donovan punched one of the men in the face, knocking him to the ground.  *Id.*  One of Donovan's companions then stabbed and killed the man Donovan had punched.  *Id.*  Donovan testified that he did not know his companion had a knife, *id.* at 695 n.3, and did not see the stabbing.  *Id.* at 695.  Testimony was offered that Donovan stole the stabbed man's wallet and that one of Donovan's companions stole the other man's wallet before Donovan and his companions fled from the scene.  *Id.*  Donovan denied participating in the robbery, but was convicted of felony murder and sentenced to life imprisonment without parole.  Parole Board Decision at 1-2.

**{46}**    Donovan was one of the first juvenile offenders in Massachusetts considered for parole in the wake of the line of cases that include *Graham* and *Miller* and which recognize that juvenile offenders are constitutionally different from adults for purposes of sentencing.  *See Diatchenko v. Dist. Attorney for Suffolk Dist.*, 1 N.E.3d 270, 276–77 (Mass. 2013) (discussing *Roper*, *Graham*, and *Miller* and concluding that the Massachusetts statute imposing life without the possibility of parole on juvenile offenders who commit first-degree murder is unconstitutional and holding that these juvenile offenders must be considered for parole eligibility); Parole Board Decision at 3.  The parole board determined that Donovan "did not commit, intend, encourage, or foresee the stabbing that caused the victim's death."  Parole Board Decision at 7.  A forensic psychologist testified at the parole hearing that "Donovan was impulsive, immature, and directionless as a young person but that did not result in an early onset of violence in childhood or early teenage years."  Parole Board Decision at 6.  The psychologist was persuaded that Donovan has "no history of major conduct problems" and attributed Donovan's conduct on the night of September 18, 1992 to a lack of impulse control and a vulnerability to peer pressure.  Parole Board Decision at 6.  Donovan's parole application was granted. Parole Board Decision at 1.

**{47}**    When Ira was fourteen to fifteen years old, he repeatedly raped his younger stepsister.  *Ira*, 2002-NMCA-037, ¶ 6.  The rapes occurred over a two-year period when she was eight to nine years old.  *Id.* ¶ 5.  In the course of the many rapes, Ira penetrated her mouth, vagina, and anus.  *Id.* ¶ 6.  These penetrations caused her such pain that she would scream into a pillow.  *Id.*  After one forcible sodomy where she screamed from the pain, Ira's

---

[3]The Commonwealth of Massachusetts Executive Office of Public Safety Parole Board's Decision, Joseph Donovan is available electronically at http://www.mass.gov/eopss/docs/pb/lifer-decisions/2014/donovan-joseph-8-7-14-paroled.pdf (last visited February 27, 2018).

penis was covered in blood from an anal tear. At other times, she nearly vomited. *Id.* Ira urinated and ejaculated into her mouth and forced her to swallow. *Id.* He frequently threatened to kill her if she alerted anyone about the rapes and one time choked her to unconsciousness. *Id.* He used subtle hand gestures—drumming or tapping his fingers on the arm of his chair—to signal to her that she would soon be raped again. *Id.*

**{48}** Ira was charged with ten counts of first-degree criminal sexual penetration and various other counts. *Id.* ¶ 2. He pleaded no contest to all of the charges except one. *Id.* ¶ 4. At sentencing, the testimony indicated that Ira did not feel remorseful about his conduct, refused to take responsibility for his actions, and believed that "he did not do anything wrong." *Id.* ¶¶ 8, 10. A mental health expert testified that Ira has "a severe conduct disorder, with tendencies towards violent sexual behavior and domination, that would require intensive, secured, long-term treatment." *Id.* ¶ 10.

**{49}** I offer these contrasting cases to highlight the fact that there are meaningful and self-evident distinctions between a juvenile offender like Donovan and a juvenile offender like Ira. Most critically, Donovan did not engage in repeated, violent attacks against others. He committed one violent act, which experts attributed to impulsiveness and immaturity. Ira, on the other hand, perpetrated repeated, horrific crimes over two years which experts attributed to a significant conduct disorder that manifests as a propensity for sexually violent behavior. Our understanding of the rule articulated in *Graham* should acknowledge that there are significant differences between single act and multiple act juvenile offenders. There is an abundance of legal support for the conclusion that this difference is legally salient.

**{50}** First, the text of *Graham* itself compels the conclusion that the rule articulated in *Graham* does not extend to Ira. In *Graham*, the Supreme Court made clear that the categorical rule announced applies only to "juvenile offenders sentenced to *life without parole* solely for a nonhomicide offense." 560 U.S. at 63 (emphasis added); *id.* at 74 ("This Court now holds that for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of *life without parole*." (emphasis added)). The Court emphasized that a sentence of "life without parole" is unique. *See id.* at 69 ("[L]ife without parole is the second most severe penalty permitted by law. It is true that a death sentence is unique in its severity and irrevocability, yet life without parole sentences share some characteristics with death sentences that are shared by no other sentences." (internal quotation marks and citations omitted)). Ira was not sentenced to life without parole; he was sentenced to five consecutive adult sentences of CSP I and one consecutive adult sentence of intimidation of a witness. *Ira*, 2002-NMCA-037, ¶ 14. Because Ira was not sentenced to life without parole, the categorical rule in *Graham* is inapplicable to him. This conclusion is not based on a constrained or overly formalistic reading of *Graham*.

**{51}** Justice Alito made clear in his dissenting opinion in *Graham* that "[n]othing in the Court's opinion affects the imposition of a sentence to a term of years without the possibility of parole." 560 U.S. at 124 (Alito, J., dissenting). Justice Thomas pointed out, in his

dissenting opinion in *Graham*, that the majority did not count juveniles "sentenced to lengthy term-of-years sentences (e.g., 70 or 80 years' imprisonment)[,]" when surveying the number of juvenile offenders serving life without parole sentences in the United States—that survey revealed that there were 123 juvenile offenders serving life without parole nationwide. *Id.* at 113 n.11 (Thomas, J., dissenting). The number of juveniles with multiple, lengthy, term-of-years sentences would likely number in the thousands, and Justice Thomas's observation that these offenders were not considered by the majority in their survey strongly suggests that the majority did not intend to bring this class of juvenile offenders within the ambit of the categorical rule articulated in *Graham*.

**{52}** Second, a lengthy, aggregate, consecutive, term-of-years sentence for multiple offenses is not the functional equivalent of life imprisonment for a single crime. An aggregate, consecutive, term-of-years sentence for multiple offenses is just that: it is an aggregate punishment for multiple offenses. Our case law already acknowledges this important distinction. *See State v. Juan*, 2010-NMSC-041, ¶ 40, 148 N.M. 747, 242 P.3d 314 ("Life sentences have always been understood to be different from a sentence for a term of years." (alteration, internal quotation marks and citation omitted)).

**{53}** Third, "it is wrong to treat stacked sanctions as a single sanction. To do so produces the ridiculous consequence of enabling a prisoner, simply by recidivating, to generate a colorable Eighth Amendment claim." *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001). Moreover, and as the Supreme Court recognized long ago, "[i]t would scarcely be competent for a person to assail the constitutionality of the statute prescribing a punishment for burglary on the ground that he had committed so many burglaries that, if punishment for each were inflicted on him, he might be kept in prison for life." *O'Neil v. Vermont*, 144 U.S. 323, 331 (1892). The preceding quoted passage from *O'Neil* is dictum, but the validity of the logic underpinning the quote is persuasive and this logic has indeed persuaded courts to reject "Eighth Amendment challenge[s] to consecutive sentences." *State v. Ali*, 895 N.W.2d 237, 245 (Minn. 2017).

**{54}** Fourth, "if the sentence for a particular offense is not disproportionately long, it does not become so merely because it is consecutive to another sentence for a separate offense or because the consecutive sentences are lengthy in aggregate." *State v. Berger*, 134 P.3d 378, 384 (Ariz. 2006) (en banc). "This proposition holds true even if a defendant faces a total sentence exceeding a normal life expectancy as a result of consecutive sentences." *Id.* "[A] separate [Eighth Amendment] proportionality review must be completed for each sentence imposed consecutively, rather than considering the cumulative total of such consecutive sentences. [This is b]ecause each sentence is a separate punishment for a separate offense[.]" *Lucero*, 2017 CO 49, ¶ 23 (second alteration in original); *accord Hawkins v. Hargett*, 200 F.3d 1279, 1285 n.5 (10th Cir. 1999) ("The Eighth Amendment analysis focuses on the sentence imposed for each specific crime, not on the cumulative sentence for multiple crimes.").

**{55}** Fifth, "it is constitutionally permissible to punish a person who commits two, three,

18

four or even more crimes (including murder) more severely than a person who commits a single crime." *Ali*, 895 N.W.2d at 243.  Under New Mexico law, "[a] sentencing judge has discretion in determining whether sentences are to run consecutively or concurrently." *State v. Deats*, 1971-NMCA-089, ¶ 24, 82 N.M. 711, 487 P.2d 139.  The sentencing judge's "discretion in this area will not be interfered with unless he has violated one of the sentencing statutes." *Id.*  This Court has observed that "the imposition of separate sentences to run consecutively is lawful and violates no federally protected right." *State v. Padilla*, 1973-NMSC-049, ¶ 14, 85 N.M. 140, 509 P.2d 1335.  Moreover, this Court has recognized that "imposition of multiple valid sentences to run consecutively does not, as such, constitute cruel and unusual punishment as contemplated by the Eighth Amendment to the Constitution of the United States." *Id.* ¶ 15.

**{56}**   Sixth and finally, there are strong penological rationales to justify application of consecutive sentencing upon juveniles who commit multiple nonhomicide offenses. *Contra Graham*, 560 U.S. at 71 ("With respect to *life without parole* for juvenile nonhomicide offenders, none of the goals of penal sanctions that have been recognized as legitimate . . . provides an adequate justification." (emphasis added) (citation omitted)).  "The offender who commits two armed robberies should, all other things being equal, serve more time than the offender who commits one robbery.  Concurrent sentences frustrate this objective, and consecutive sentences thus should be the rule in a just deserts model."  Harvey S. Perlman and Carol G. Stebbins, *Implementing an Equitable Sentencing System: The Uniform Law Commissioners' Model Sentencing and Corrections Act*, 65 Va. L. Rev. 1175, 1220 (1979).  As to deterrence, commentators have observed that "consecutive sentences are appropriate where a defendant has committed a series of heinous crimes so as not to provide a multiple offense discount which would not reflect the seriousness of a defendant's conduct."  Baldwin's Oh. Prac. Crim. L. § 118:16 *Consecutive sentences* (3d ed.) (internal quotation marks and citation omitted).

**{57}**   *Graham* is the law; juveniles convicted of a nonhomicide offense cannot be sentenced to life imprisonment without parole. 575 U.S. at 74.  But this proposition does not answer the issue here:  whether *Graham* extends to defendants like Ira who have committed many crimes over a period of time and who have been sentenced to multiple, consecutive, lengthy, term-of-years sentences.  Policy concerns that are all but self-evident from comparison of Donovan's and Ira's cases as well as abundant, established law convinces me that the categorical rule articulated in *Graham* does not extend to Ira.  Because the majority reaches the opposite conclusion, Maj. op. ¶ 4, I dissent.  I concur, however, with the majority's conclusion that Ira has a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation as he will be eligible for a parole hearing at age sixty-two.  Maj. op. ¶ 35.  I also concur with the majority's ultimate conclusion that Ira's petition for habeas corpus should be denied.  Maj. op. ¶ 42.

_____

**JUDITH K. NAKAMURA, Chief Justice**

**I CONCUR:**

_____

**PETRA JIMENEZ MAES, Justice**