IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-530

Filed: 6 October 2020

Cumberland County, No. 01 CRS 059934

STATE OF NORTH CAROLINA

v.

JAMES RYAN KELLIHER, Defendant.

Appeal by Defendant from judgments entered 13 December 2018 by Judge Carl R. Fox in Cumberland County Superior Court. Heard in the Court of Appeals 18 February 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General Kimberly N. Callahan, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Kathryn L. VandenBerg, for Defendant.*

McGEE, Chief Judge.

James Ryan Kelliher ("Defendant"), following a troubled early life marked by physical abuse and substance use, participated in a robbery at age 17 that ended with the murders of a man and his pregnant girlfriend. Defendant was sentenced to two consecutive mandatory punishments of life without parole ("LWOP"). Following the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460, 183 L. Ed. 2d 407 (2012), and the General Assembly's enactment of N.C. Gen. Stat. § 15A-1340.19A, *et seq.* in response, Defendant sought and received a resentencing hearing.

At resentencing, the trial court determined that mitigating factors outweighed the circumstances of the offenses, concluded Defendant was neither "incorrigible" nor "irredeemable," *Graham v. Florida*, 560 U.S. 48, 72, 75, 176 L. Ed. 2d 825, 844, 846 (2010), and resentenced him to two consecutive sentences of life with parole. Under the terms of these sentences, Defendant will not be eligible for parole until he has served 50 years in prison, placing his earliest possible release at age 67. Defendant now appeals, arguing that the consecutive sentences constitute *de facto* LWOP in violation of the Eighth Amendment and Article I, Section 27 of the North Carolina Constitution. We agree with Defendant and reverse and remand for resentencing.

## I. <u>FACTUAL AND PROCEDURAL HISTORY</u>

*A. Defendant's Early Life*

Defendant was born in 1984 as the youngest of three siblings. Though he had good relationships with his mother and older sisters, Defendant's father physically abused him during his childhood. Defendant began abusing substances at an early age; he began drinking alcohol at age 13, was drinking daily and using marijuana at age 15, and was under the continuous influence of some combination of alcohol, marijuana, ecstasy, acid, psilocybin, and cocaine at age 17. Defendant attempted suicide on three occasions: first by overdose at age 10, again at age 17 on the night after the murders, and a final time while awaiting trial. He dropped out of school in the ninth grade, and exhibited the equivalent of a sixth grade education at age 17.

Defendant committed several thefts in his teenage years, breaking and entering into vehicles and stores after they had closed. On one occasion, Defendant stole from a video store with the help of someone named Jerome Branch. Defendant, Mr. Branch, and Joshua Ballard would "hang out" together during this time, drinking alcohol and doing drugs.

*B. The Murders*

In the days before the murders involved in this appeal, Mr. Ballard suggested to Defendant that they rob a cocaine and marijuana dealer named Eric Carpenter. The two discussed the matter several times, with Mr. Ballard stating in later conversations that he believed he would have to kill Mr. Carpenter in order to avoid being identified as one of the perpetrators of the robbery. Defendant offered to give a firearm he had previously stolen from a pawn shop to Mr. Ballard for this purpose. They continued to plan the robbery over future phone calls, ultimately agreeing that Defendant would serve as the driver while Mr. Ballard killed and robbed Mr. Carpenter. Mr. Branch was later included in the planning, though he was never given a defined role. Defendant also told his friend Liz Perry about the plans to rob and murder Mr. Carpenter.

Mr. Ballard arranged to purchase drugs from Mr. Carpenter behind a local furniture store on 7 August 2001. On the night of the drug deal, Defendant drove Mr. Ballard and Mr. Branch to the furniture store in Mr. Ballard's truck. They met with

Mr. Carpenter when they arrived, but they spotted a marked police vehicle in the parking lot and arranged with Mr. Carpenter to move the deal to his apartment. Carpenter's girlfriend, Kelsea Helton, also lived at the apartment, and was present when the group reconvened in the apartment parking lot a short time later. Following introductions, everyone went inside the apartment and began talking civilly. Ms. Helton left the apartment briefly; when she returned,[1] the conversation turned to her pregnancy. What exactly occurred after that conversation is disputed; what is certain, however, is that when it came time to carry out the robbery, Defendant, Mr. Ballard, or both shot and killed Mr. Carpenter and Ms. Helton.

Defendant, Mr. Branch, and Mr. Ballard met in the parking lot after the shooting and split the drugs they had stolen from the apartment. The three met with another group, which included Defendant's friend, Ms. Perry, at a local park where they drank cognac and smoked marijuana laced with cocaine. At some point during the evening, Defendant told Ms. Perry about the robbery and murders. Defendant, Mr. Ballard and Mr. Branch were later arrested for the murders.

C. *Defendant's Plea and Ballard's Trials*

Defendant was indicted on two counts of first-degree murder, two counts of robbery with a dangerous weapon, and one count of conspiracy to commit robbery

---

[1] Ms. Helton's father, in his victim impact statement, said Ms. Helton left the apartment to call her sister to finalize plans to vacate Mr. Carpenter's apartment and move in with her sister later that evening because Ms. Helton felt there were "some things that [were] happening [she] d[id]n't like."

with a dangerous weapon by a grand jury on 25 March 2002. He pleaded guilty to all charges in 2004 and was sentenced to two consecutive terms of LWOP for the murders and concurrent terms of years for the robbery and conspiracy convictions.[2] Mr. Ballard was also charged with two counts of first-degree murder but pleaded not guilty.

Although his plea agreement did not require it, Defendant testified for the State at Mr. Ballard's trial,[3] as did Ms. Perry and a friend of Mr. Ballard, Lisa Boliaris. Defendant testified that he did not shoot either Mr. Carpenter or Ms. Helton, instead stating that Mr. Ballard shot both victims. Ms. Perry offered a different account, stating that Defendant had admitted to killing the couple on the night of the murders. Ms. Boliaris gave yet another recollection of events, testifying that Mr. Ballard told her he shot Mr. Carpenter while Defendant killed Ms. Helton.[4]

Mr. Carpenter was convicted of the killings at the conclusion of his trial. However, his convictions were set aside on appeal and Mr. Ballard was granted a new trial. *Ballard*, 180 N.C. App. at 646, 638 S.E.2d at 481. Defendant again testified for the State on retrial, but Mr. Ballard was ultimately acquitted. The district attorney who secured Defendant's plea and prosecuted both of Mr. Ballard's trials later wrote

---

[2] Defendant has since served the terms for robbery and conspiracy.

[3] Mr. Branch pled guilty to accessory after the fact and was sentenced to a six-to-eight-year term of imprisonment. He did not testify against Mr. Ballard.

[4] A more detailed rendition of this testimony is available in this Court's opinion in *State v. Ballard*, 180 N.C. App. 637, 638 S.E.2d 474 (2006).

a letter to Defendant's counsel stating that he believed Defendant "testified truthfully in both trials."

*D. Defendant's Resentencing*

Defendant filed a motion for appropriate relief ("MAR") in June 2013. In that motion, Defendant asserted that: (1) the United States Supreme Court's decision in *Miller* rendered his LWOP sentences unconstitutional under the Eighth Amendment to the United States Constitution and Article I, Section 27 of the North Carolina Constitution; (2) resentencing was required under the recently enacted N.C. Gen. Stat. § 15A-1340.19B;[5] and (3) life with the possibility of parole was the appropriate sentence. The MAR was denied by the trial court on the grounds that *Miller* and N.C. Gen. Stat. § 15A-1340.19B did not apply retroactively. That order was subsequently reversed by order of this Court, and Defendant received a resentencing hearing on 13 December 2018.

At the resentencing hearing, Defendant and the State consented to a recitation of the facts surrounding the murders consistent with the above history. The State called the fathers of Mr. Carpenter and Ms. Helton to give victim impact statements. Both testified to the indescribable hardship of losing a child—and future grandchild—

---

[5] Defendant's MAR sought relief under subsection (a)(1) of the statute, which applies to juvenile felony murder convictions. N.C. Gen. Stat. § 15A-1340.19B(a)(1) (2019). Defendant was ultimately resentenced pursuant to subsection (a)(2), which applies to all other juvenile first-degree murder convictions. N.C. Gen. Stat. § 15A-1340.19B(a)(2) (2019). Defendant did not argue the applicability of subsection (a)(1) at resentencing, conceded that this was not a felony murder case before the trial court, and does not raise the issue on appeal.

and the enduring impact on their families. Each expressed their love for their children, their dismay at the loss of life, the sadness of lost opportunities to raise their grandchild, and the lasting emotional trauma inflicted on their families. The State rested its presentation following their testimony.

Defendant presented the testimony of several witnesses in mitigation. A clinical and forensic psychologist who had examined Defendant in January and February of 2019 testified that Defendant suffered from post-traumatic stress disorder as a result of the murders. He further reported that although Defendant had a history of antisocial behavior, Defendant had ceased to exhibit those traits since he had been imprisoned in 2004. The psychologist's report detailed Defendant's childhood physical and drug abuse, his shortened education, and his efforts at self-improvement while in prison. Specifically, the report disclosed that Defendant had earned his GED and was pursuing a bachelor's degree in ministry from Southeastern Baptist Theological Seminary ("the Seminary"). Based on Defendant's history, current diagnoses, and efforts to better himself, the psychologist determined that Defendant presented a low risk of future violence and was neither incorrigible nor irredeemable. This low risk aligned with a separate assessment conducted by the Department of Public Safety.

Defendant offered additional testimony from the director of prison programs at the Seminary. He testified that Defendant was accepted into the four-year

seminary program after a rigorous application process, describing him as an active and very good student. Another witness from the Seminary testified that Defendant assisted other students, was professional in his conduct, and sought to minister to inmates outside the program who were struggling with incarceration. A pastor from Redeemer Lutheran Church in Fayetteville also testified, stating he had visited with Defendant every week since his arrest and had seen a remarkable change: "[T]oday unfortunately [Defendant] makes me ashamed of my own spirituality. . . . [H]e is the one who sometimes comforts me instead of vice versa. . . . He's the one who has consoled me. So, I enjoy immensely our visits because I think frankly I get more out of it than he does."

Defendant also tendered documentary evidence in support of mitigation, including his record of two nonviolent infractions while in prison and the assessments of low risk completed by the Department of Public Safety and Defendant's psychologist. He concluded his presentation of evidence by colloquy, telling the trial court that he knew he had "failed to do anything resembling the right thing" and thought about the victims everyday with sorrow and regret. He stated that although he knew he could never undo the pain caused, he sought to improve himself so that he might help others "as harm reduction." He concluded by telling the court he "wish[ed] more than anything that [he] could somehow do something to change the events from August 7, 2001."

In closing arguments, the State asked the trial court to sentence Defendant to either LWOP, or to consecutive sentences of life with the possibility of parole as an alternative. Defendant argued for concurrent sentences of life with the possibility of parole, requesting that the Department of Correction have the opportunity to review Defendant's eligibility for parole at 25 years rather than 50 years. The trial court then announced its order, which included thirteen findings in mitigation based on Defendant's troubled early life, his immaturity and drug addictions at the time of the offenses, and the substantial evidence of rehabilitation. Based on these findings, the trial court concluded that "[t]he mitigating factors and other factors and circumstances present outweigh all the circumstances of the offense[,]" and "Defendant is neither incorrigible nor irredeemable." The trial court then sentenced Defendant to two consecutive sentences of life with the possibility of parole. Defendant appeals.

## II. ANALYSIS

Defendant presents one principal argument on appeal: Defendant's two consecutive sentences, considered in the aggregate, constitute a disproportionate *de facto* punishment of LWOP in violation of the Eighth Amendment to the United States Constitution and Article I, Section 27 of the North Carolina Constitution. More specifically, he contends that because he is a juvenile defendant and is neither incorrigible nor irredeemable, this *de facto* LWOP sentence violates *Miller* and

related United States Supreme Court precedents, as determined by several state and federal courts that have considered the question. The State, in response, contends that Defendant failed to preserve this issue and, in the alternative, asks us to follow a different line of state and federal decisions that have rejected arguments similar to Defendant's. We first address the State's preservation argument before reaching the merits of Defendant's appeal.

*A. Preservation*

Our Supreme Court has made clear that the North Carolina Rules of Appellate Procedure require constitutional sentencing errors be raised before the trial court in order to be preserved for appellate review. *State v. Meadows*, 371 N.C. 742, 749, 821 S.E.2d 402, 407 (2018). However, a party is only required to "stat[e] the specific grounds for the ruling the party desired the court to make *if the specific grounds were not apparent from the context*[,]" N.C. R. App. P. 10(a)(1) (2020) (emphasis added), and our Supreme Court has held constitutional arguments "implicitly presented to the trial court" are preserved for review. *State v. Murphy*, 342 N.C. 813, 822, 467 S.E.2d 428, 433 (1996). Defendant insists that his argument was preserved on appeal under these precedents because: (1) his MAR sought a sentence that comported with the Eighth Amendment, *Miller*, and the North Carolina Constitution; and (2) his counsel argued for concurrent sentences based on *Miller* at the resentencing hearing. Reviewing the transcript from the resentencing hearing, Defendant's counsel did

argue that concurrent sentences were appropriate, given the alternative would

prohibit parole for 50 years:

> I would just say this as far as the punishment is concerned.
> I'm 68, if you sentence me to 50 years, I'll do the best I can
> but I'm going to leave most of that time on the floor. If you
> sentence me to 25, I may make it.
>
> If you sentence a 17-year old to 25 years, he'll do 100
> percent of that sentence probably. But at the end of 25
> years if he's serving consecutive sentences, he doesn't get
> out.
>
> . . . .
>
> And then at some point possibly he'll be paper paroled[6]
> from the first one and get to serve a minimum of 25 more
> years before he's reviewed again and then every two years.
>
> . . . .
>
> Now he's going to be in prison for a while. He's only done
> 17 years. But we're asking the Court to put it in the hands
> of Department of Corrections [sic] to let them review him
> as they have scrutinized his life for 17 years and sentence
> him to life with parole and run the sentences concurrently.

Construed together with his MAR, we hold that Defendant has, at a minimum, raised

an implied argument that two concurrent sentences of life—with the possibility of

---

[6] We note that the practice of issuing "paper parole" is no longer permitted under North Carolina law. *See Robbins v. Freeman*, 127 N.C. App. 162, 165, 487 S.E.2d 771, 773 (1997) ("[W]e can find no statutory authority for [the Department of Correction's and Parole Commission's] practice of issuing 'paper paroles.' "), *aff'd per curiam*, 347 N.C. 664, 496 S.E.2d 375 (1998). We thus understand counsel's argument as asserting that parole is not available under two consecutive sentences for life with the possibility parole until 50 years into a defendant's sentence. Both Defendant and the State agree on appeal that Defendant must serve 50 years before being eligible for parole under the consecutive sentences imposed in this case.

parole after 25 years, as opposed to 50 years—are proportional punishment under the Eighth Amendment, *Miller*, and the North Carolina Constitution. Defendant has therefore preserved his constitutional argument for review.

Although we hold Defendant has preserved his argument, we note that he has requested this Court use its discretion to invoke Rule 2 of the North Carolina Rules of Appellate Procedure and set aside the requirements of Rule 10. *See* N.C. R. App. P. 2 (2020) ("To prevent manifest injustice to a party, or to expedite decision in the public interest, either court of the appellate division may, except as otherwise expressly provided by these rules, suspend or vary the requirements of any of these rules in a case pending before it[.]"). Assuming *arguendo* that Defendant's constitutional question was not preserved under Rule 10, a discretionary implementation of Rule 2 is warranted under the circumstances. Our Supreme Court has employed the Rule "on several occasions to review issues of constitutional importance." *State v. Mobley*, 200 N.C. App. 570, 573, 684 S.E.2d 508, 510 (2009) (first citing *State v. Dudley*, 319 N.C. 656, 356 S.E.2d 361 (1987); and then citing *State v. Wiley*, 355 N.C. 592, 565 S.E.2d 22 (2002)). Given that multiple state appellate

courts[7] and federal courts of appeal[8] have addressed the constitutional issues presented here—and there are at least four other similar cases presently pending before this Court[9]—Defendant's appeal is certainly of "constitutional importance." *Mobley*, 200 N.C. App. at 573, 684 S.E.2d at 510 (citations omitted). Furthermore, the State's alleged violation of the United States Constitution in resentencing implicates a substantial right supporting application of Rule 2. *See State v. Bursell*, 372 N.C. 196, 201, 827 S.E.2d 302, 306 (2019) (affirming this Court's discretionary invocation of Rule 2 where the trial court "committed error relating to a substantial right," namely the right to be free from unreasonable searches and seizures under the Fourth Amendment). Our Supreme Court has invoked Rule 2 "more frequently in the criminal context when severe punishments were imposed[,]" lending further support to its application here. *State v. Hart*, 361 N.C. 309, 316, 644 S.E.2d 201, 205

---

[7] *See Pedroza v. State*, 291 So.3d 541 (Fla. 2020); *State v. Slocumb*, 827 S.E.2d 148 (S.C. 2019); *Carter v. State*, 192 A.3d 695 (Md. 2018); *Veal v. State*, 810 S.E.2d 127 (Ga.), *cert. denied*, ____ U.S. ____, 139 S. Ct. 320, 202 L. Ed. 2d 218 (2018); *Ira v. Janecka*, 419 P.3d 161 (N.M. 2018); *Kinkel v. Persson*, 417 P.3d 401 (Or. 2018), *cert. denied,* ____ U.S. ____, 139 S. Ct. 789, 202 L. Ed. 2d 585 (2019); *Lucero v. People*, 394 P.3d 1128 (Colo. 2017), *cert. denied*, ____ U.S. ____, 138 S. Ct. 641, 199 L. Ed. 2d 544 (2018); *State v. Ali*, 895 N.W.2d 237 (Minn. 2017), *cert. denied*, ____ U.S. ____, 138 S. Ct. 640, 199 L. Ed. 2d 543 (2018); *State ex. rel Carr v. Wallace*, 527 S.W.3d 55 (Mo. 2017); *Steilman v. Michael*, 407 P.3d 313 (Mont. 2017); *State v. Zuber*, 152 A.3d 197, (N.J. 2017); *State v. Ramos*, 387 P.3d 650 (Wash. 2017) (en banc); *People v. Reyes*, 63 N.E.3d 884 (Ill. 2016); *State ex rel. Morgan v. State*, 217 So.3d 266 (La. 2016); *State v. Moore*, 76 N.E.3d 1127 (Ohio 2016); *Vasquez v. Commonwealth,* 781 S.E.2d 920 (Va. 2016); *Casiano v. Comm'r of Corr.,* 115 A.3d 1031 (Conn. 2015); *State v. Boston*, 363 P.3d 453 (Nev. 2015); *Bear Cloud v. State*, 334 P.3d 132 (Wyo. 2014); *State v. Ragland*, 836 N.W.2d 107 (Iowa 2013); *People v. Caballero,* 282 P.3d 291 (Cal. 2012).

[8] *See United States v. Grant*, 887 F.3d 131, *reh'g en banc granted, opinion vacated*, 905 F.3d 285 (3rd Cir. 2018); *Kelly v. Brown*, 851 F.3d 686 (7th Cir. 2017); *Moore v. Biter*, 725 F.3d 1184 (9th Cir. 2013); *Budder v. Addison*, 851 F.3d 1047 (10th Cir.); *Bunch v. Smith*, 685 F.3d 546 (6th Cir. 2012).

[9] *See State v. Anderson*, No. COA19-841; *State v. Slade*, No. COA19-969; *State v. Conner*, No. COA19-1087; *State v. Brimmer*, No. COA19-1103.

(2007) (first citing *State v. Moore*, 335 N.C. 567, 612, 440 S.E.2d 797, 823 (1994); then citing *State v. Booher*, 305 N.C. 554, 564, 290 S.E.2d 561, 566 (1982); then citing *State v. Poplin*, 304 N.C. 185, 186-87, 282 S.E.2d 420, 421 (1981); and then citing *State v. Adams*, 298 N.C. 802, 804, 260 S.E.2d 431, 432 (1979)).  We therefore conclude that, even if Defendant failed to preserve his constitutional argument through valid objection under Rule 10, review of his appeal is appropriate pursuant to Rule 2.

## B.  *The Eighth Amendment and Juveniles*

Resolution of this appeal requires consideration of the Eighth Amendment as applied to juveniles under four decisions of the Supreme Court of the United States: *Roper v. Simmons*, 543 U.S. 551, 161 L. Ed. 2d 1 (2005), *Graham v. Florida*, 560 U.S. 48, 176 L. Ed. 2d 825 (2010), *Miller v. Alabama*, 567 U.S. 460, 183 L. Ed. 2d 407 (2012), and *Montgomery v. Louisiana*, ____ U.S. ____, 193 L. Ed. 2d 599 (2016).

### 1.  *Roper* **Prohibits Execution of Juveniles**

In the first of these cases, the Supreme Court considered "whether it is permissible under the Eighth and Fourteenth Amendments . . . to execute a juvenile offender who was older than 15 but younger than 18 when he committed a capital crime." *Roper*, 543 U.S. at 555-56, 161 L. Ed. 2d at 13.  It examined the question first by conducting "a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question[,]" before "determinin[ing], in the exercise of our own independent judgment, whether the

death penalty is a disproportionate punishment for juveniles." *Id.* at 564, 193 L. Ed. 2d at 18. The Supreme Court ultimately answered the question in the affirmative, issuing a categorical holding that "the Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." *Id.* at 578, 161 L. Ed. 2d at 28.

In conducting the first step of its two-pronged examination, the Supreme Court observed that, in the years leading up to the case, there was a "significant" and "consistent" trend away from the execution of juveniles amongst the States, *id.* at 565-66, 161 L. Ed. 2d at 19-20, leading to the conclusion that "[a] majority of States have rejected the imposition of the death penalty on juvenile offenders under 18[.]" *Id.* at 568, 161 L. Ed. 2d at 21. It then turned to the second step: whether the Eighth Amendment compelled a categorical prohibition against the execution of juveniles. *Id.* The majority found the answer by recognizing that "the death penalty is reserved for a narrow category of crimes and offenders[,]" *id.* at 568-69, 161 L. Ed. 2d at 21, and then discerning that, because of their unique developmental characteristics, "juvenile offenders cannot with reliability be classified among the worst offenders." *Id.* at 569, 161 L. Ed. 2d at 21. Once these precepts were established, the Supreme Court concluded that "the penological justifications for the death penalty apply to them with lesser force than to adults[,]" *id.* at 571, 161 L. Ed. 2d. at 23, meaning that "[w]hen a juvenile offender commits a heinous crime, the State can exact forfeiture of

some of the most basic liberties, but the State cannot extinguish his life and his potential to attain a mature understanding of his own humanity." *Id.* at 573-74, 161 L. Ed. 2d at 24.

*Roper* makes clear that its logic is grounded in the fundamental recognition that juveniles are of a special character for the purposes of the Eighth Amendment. In examining juveniles as a class of criminal offenders, the Supreme Court observed that "[t]hree general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders." *Id.* at 570, 161 L. Ed. 2d at 21. Compared to adults, juveniles possess " '[a] lack of maturity and an underdeveloped sense of responsibility . . . . These qualities often result in impetuous and ill-considered actions and decisions.' " *Id.* (alteration in original) (quoting *Johnson v. Texas*, 509 U.S. 350, 367, 125 L. Ed. 2d 290, 306 (1993)) (additional citation omitted). Such immaturity "means 'their irresponsible conduct is not as morally reprehensible as that of an adult.' " *Id.* at 570, 161 L. Ed. 2d at 22 (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 835, 101 L. Ed. 2d 702, 719 (1988) (plurality opinion)). Juveniles are likewise "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. . . . [J]uveniles have less control, or less experience with control, over their own environment," *id.* at 569, 161 L. Ed. 2d at 22 (citations omitted), providing them "a greater claim than adults to be forgiven for failing to escape negative influences in

their whole environment." *Id.* at 570, 161 L. Ed. 2d at 22 (citation omitted). Lastly, "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id.* (citation omitted). "From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Id.* This is no less true of juveniles guilty of "a heinous crime." *Id.* On the whole, juveniles are thus of "diminished culpability[.]" *Id.* at 571, 161 L. Ed. 2d at 23.

These unique qualities and resultant lesser culpability undercut the penological justifications behind the death penalty. *Id.* Death as retribution is disproportionate:

> Whether viewed as an attempt to express the community's moral outrage or as an attempt to right the balance for the wrong to the victim, the case for retribution is not as strong with a minor as with an adult. Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity.

*Id.* Deterrence does not even the scales:

> [I]t is unclear whether the death penalty has a significant or even measurable deterrent effect on juveniles . . . . [T]he absence of evidence of deterrent effect is of special concern because the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence. . . . To the extent the juvenile death penalty might have residual deterrent effect, it is worth noting that the punishment of life

> imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person.

*Id.* at 571-72, 161 L. Ed. 2d at 23. The Supreme Court would later examine exactly when the "severe sanction" of LWOP may be imposed on juveniles in *Graham*.

## 2. *Graham* Prohibits LWOP for Juveniles in Non-Homicide Cases

In *Graham*, the Supreme Court extended the categorical rationale in *Roper* to hold that juveniles may not be sentenced to LWOP for non-homicide offenses under the Eighth Amendment. 560 U.S. at 61-62, 74, 176 L. Ed. 2d at 837, 845. Taking the same two-pronged approach, the majority first determined that, in light of actual sentencing practices rather than strict consideration of legislative prohibitions, "life without parole sentences for juveniles convicted of nonhomicide crimes is as rare as other sentencing practices found to be cruel and unusual." *Id.* at 66, 176 L. Ed. 2d at 840. Thus, though the practice was permitted in many states, it was nonetheless "exceedingly rare. And 'it is fair to say that a national consensus has developed against it.' " *Id.* at 67, 176 L. Ed. 2d. at 841 (quoting *Atkins v. Virginia*, 536 U.S. 304, 316, 153 L. Ed. 2d 335, 347 (2002)).

At the second step, the *Graham* Court took *Roper*'s observations about juveniles as foundational precepts:

> *Roper* established that because juveniles have lessened culpability they are less deserving of the most severe punishments. 543 U.S., at 569. As compared to adults, juveniles have a " 'lack of maturity and an underdeveloped sense of responsibility' "; they "are more vulnerable or

> susceptible to negative influences and outside pressures, including peer pressure"; and their characters are "not as well formed." *Id.,* at 569–570. These salient characteristics mean that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.,* at 573. Accordingly, "juvenile offenders cannot with reliability be classified among the worst offenders." *Id.,* at 569. A juvenile is not absolved of responsibility for his actions, but his transgression "is not as morally reprehensible as that of an adult." *Thompson, supra,* at 835 (plurality opinion).

*Id.* at 68, 176 L. Ed. 2d at 841. The Supreme Court then deemed it "relevant to consider next the nature of the offenses to which this harsh penalty [of LWOP] might apply[,]" *id.* at 68-69, 176 L. Ed. 2d at 842, and determined that not only are juveniles fundamentally less culpable, but, "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis." *Id.* at 69, 176 L. Ed. 2d at 842.

The Supreme Court turned next to the nature of the punishment. "[L]ife without parole is the second most severe penalty permitted by law." *Id.* (citation and quotation marks omitted). LWOP sentences thus:

> share some characteristics with death sentences that are shared by no other sentences. . . . [T]he sentence alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration[.] . . . [T]his sentence means denial of hope; it means that good behavior and character improvement

- 19 -

> are immaterial; it means that whatever the future might hold in store for the mind and spirit . . . he will remain in prison for the rest of his days.

*Id.* at 69-70, 176 L. Ed. 2d at 842 (citation and quotation marks omitted). Such lifelong permanence "is . . . especially harsh . . . for a juvenile. . . . A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only. This reality cannot be ignored." *Id.* at 70-71, 176 L. Ed. 2d at 843 (citations omitted).

As a final consideration, the Supreme Court examined the penological underpinnings as applied to non-homicide juvenile defendants. In rejecting retribution and deterrence as valid objectives, *id.* at 71-72, 176 L. Ed. 2d. at 843-44, the majority relied extensively on *Roper*, reiterating that juveniles' unique qualities render them less culpable and "less likely to take a possible punishment into consideration when making decisions." *Id.* at 72, 176 L. Ed. 2d at 844. Incapacitation, too, was an inadequate justification for related reasons; juveniles are malleable, yet "[t]o justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible. . . . [I]ncorrigibility is inconsistent with youth. . . . [LWOP] improperly denies the juvenile offender a chance to demonstrate growth and maturity." *Id.* at 72-73, 176 L. Ed. 2d at 844-45 (citation and quotation marks omitted). The Supreme Court further held rehabilitation, a fourth penological

objective, is entirely irreconcilable with LWOP sentences. *Id.* at 74, 176 L. Ed. 2d at 845.

Absent any adequate penological theory, and in light of "the limited culpability of juvenile homicide offenders; and the severity of life without parole sentences[,]" the Supreme Court concluded that a categorical bar akin to *Roper* was required by the Eighth Amendment. *Id.* It further stressed that "[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give [such] defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75, 176 L. Ed. 2d at 845-46.

### 3. *Miller* Prohibits Mandatory LWOP for Juvenile Homicide Defendants

The Supreme Court, relying on *Roper* and *Graham*, held in *Miller* that mandatory LWOP for a juvenile defendant convicted of homicide crimes is a disproportionate punishment under the Eighth Amendment. 567 U.S. at 465, 183 L. Ed. 2d at 414-15. Its ruling was derived from "two strands of precedent reflecting our concern with proportionate punishment." *Id.* at 470, 183 L. Ed. 2d at 417. The first, which included *Roper* and *Graham*, announced categorical prohibitions against certain sentences "based on mismatches between the culpability of a class of offenders and the severity of a penalty." *Id.* (citation omitted). The second line "prohibited mandatory imposition of capital punishment, requiring that sentencing authorities

consider the characteristics of a defendant and the details of his offense before sentencing him to death." *Id.* at 470, 183 L. Ed. 2d at 418 (citations omitted). Taken together, "these two lines of precedent lead[] to the conclusion that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." *Id.*

The Court's analysis in *Miller* began with *Roper* and *Graham*, which "establish that children are constitutionally different from adults for purposes of sentencing." *Id.* at 471, 183 L. Ed. 2d at 418. Reiterating the three differences between adult and juvenile defendants identified in those two cases—immaturity, vulnerability to influence and lack of control, and malleability—as observations based "on common sense . . . [and] science and social science[,]" *id.* at 471, 183 L. Ed. 2d at 418-19, the Court again acknowledged that "those findings . . . both lessened a child's moral culpability and enhanced the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed." *Id.* at 472, 183 L. Ed. 2d at 419 (citations and quotation marks omitted). It once more stated that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id.* Also, though it acknowledged *Graham*'s categorical holding applied only to non-homicide offenses, the Supreme Court clarified that "none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. . . . So *Graham*'s reasoning implicates any life-

without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." *Id.* at 473, 183 L. Ed. 2d at 420.

In considering the penalty itself, *Miller* pulled a flat parallel out of *Graham*: the " '[t]reat[ment] [of] juvenile life sentences as analogous to capital punishment.' " *Id.* at 475, 183 L. Ed. 2d at 421 (alteration in original) (quoting *Graham*, 560 U.S. at 89, 176 L. Ed. 2d at 856 (Roberts, C.J., concurring in the judgment)). The Supreme Court thus turned to its line of death penalty cases, which require individualized sentencing "so that the death penalty is reserved only for the most culpable defendants committing the most serious offenses." *Id.* at 475-76, 183 L. Ed. 2d at 421 (citations omitted). When that line is considered "[i]n light of *Graham's* reasoning, th[o]se decisions too show the flaws of imposing mandatory life-without-parole sentences on juvenile homicide offenders." *Id.* at 476, 183 L. Ed. 2d at 422. Mandatory LWOP sentences for juvenile homicide offenders thus ran afoul of both lines as disproportionate even though such sentences did not fit squarely within their express holdings. *Id.* at 479, 183 L. Ed. 2d at 424.

### 4. *Montgomery: Miller* **Is Substantive Rule of Retroactive Effect**

The core question in *Montgomery* was whether *Miller*'s holding announced a substantive rule of retroactive effect. ___ U.S. at ___, 193 L. Ed. 2d at 610. In concluding that it did, the Supreme Court clarified the applicability of *Roper*, *Graham*, and *Miller* in several ways pertinent to this appeal. First, it explained "[t]he

'foundation stone' for *Miller*'s analysis was this Court's line of precedent holding

certain punishments disproportionate when applied to juveniles. Those cases include

*Graham . . .* and *Roper*." *Montgomery*, ___ U.S. at ___, 193 L. ed. 2d at 618 (citations

omitted). Second, and of particular importance to this appeal, it explained that *Miller*

announced a categorical prohibition against LWOP sentences for juvenile homicide

defendants who are not "irreparably corrupt":

> *Miller* . . . did more than require a sentencer to consider a
> juvenile offender's youth before imposing life without
> parole; it established that the penological justifications for
> life without parole collapse in light of "the distinctive
> attributes of youth." *Id.,* [567 U.S. at 472], 132 S. Ct. 2455,
> 2465, 183 L. Ed. 2d 407, 419. Even if a court considers a
> child's age before sentencing him or her to a lifetime in
> prison, that sentence still violates the Eighth Amendment
> for a child whose crime reflects " 'unfortunate yet transient
> immaturity.' " *Id.,* at [479], 132 S. Ct. 2455, 2469, 183 L.
> Ed. 2d 407, 424 (quoting *Roper,* 543 U.S., at 573, 125 S. Ct.
> 1183, 161 L. Ed. 2d 1). Because *Miller* determined that
> sentencing a child to life without parole is excessive for all
> but " 'the rare juvenile offender whose crime reflects
> irreparable corruption,' " 567 U.S., at [479-80], 132 S. Ct.
> 2455, 2469, 183 L. Ed. 2d 407, 424 (quoting *Roper, supra,*
> at 573, 126 S. Ct. 1183, 161 L. Ed. 2d 1), it rendered life
> without parole an unconstitutional penalty for "a class of
> defendants because of their status"—that is, juvenile
> offenders whose crimes reflect the transient immaturity of
> youth. *Penry,* 492 U.S., at 330, 109 S. Ct. 2934, 106 L. Ed.
> 2d 256. As a result, *Miller* announced a substantive rule of
> constitutional law.

*Id.* at ___, 193 L. Ed. 2d at 619-20. Thus, *Montgomery*, as a distillation of *Roper*,

*Graham*, and *Miller*, made clear that juvenile homicide offenders who are neither

incorrigible nor irreparably corrupt, are—like other juvenile offenders—so distinct in their immaturity, vulnerability, and malleability as to be outside the realm of LWOP sentences under the Eighth Amendment.

## C. *Defendant's Sentence and* De Facto *LWOP*

Defendant's argument asks us to apply the above principle from *Miller*, derived from *Roper* and *Graham* and plainly stated in *Montgomery*, to hold that Defendant's consecutive sentences of life with parole constitute a *de facto* LWOP sentence in violation of those precedents and the Eighth Amendment and Article I, Section 27 of the North Carolina Constitution.[10]  Specifically, he contends that because he will not be eligible for parole until age 67, he will not be afforded a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," *Graham*, 569 U.S. at 75, 176 L. Ed. 2d. at 846, and will suffer "no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope." *Id.* at 79, 176 L. Ed. 2d at 848.  *See also Miller*, 567 U.S. at 479, 183 L. Ed. 2d at 424 (quoting the first excerpt from *Graham*).  His ultimate argument thus consists of three constituent questions that do not appear to have been answered by the courts of this State and have caused concern in other jurisdictions: (1) are *de facto* LWOP sentences, as opposed to sentences expressly named as such, cognizable and barred as cruel and

---

[10] Our Supreme Court "historically has analyzed cruel and/or unusual punishment claims by criminal defendants the same under both the federal and state Constitutions."  *State v. Green*, 348 N.C. 588, 603, 502 S.E.2d 819, 828 (1998).  Our analysis therefore applies equally to both.

unusual when applied to redeemable juveniles under the Eighth Amendment; (2) can aggregated punishments, *i.e.* multiple consecutive sentences totaling a lengthy term of years, amount to a *de facto* LWOP sentence; and (3) must a *de facto* LWOP punishment obviously exceed a juvenile defendant's natural life, or does some term of years that may (or may not) fall short of the juvenile's full lifespan nonetheless constitute an impermissible *de facto* LWOP sentence?

### 1. *De Facto* LWOP Sentences

The question of whether *de facto* LWOP sentences are cognizable as a cruel and unusual punishment barred under *Graham* and *Miller* has been answered by a sizeable number of state appellate courts. Of those identified by this Court as having addressed the issue, these jurisdictions predictably fall into two camps: (1) those that recognize *de facto* LWOP sentences as cognizable and may warrant relief under the

Eighth Amendment;[11] and (2) those that have thus far decided not to do so.[12] A clear

majority of these states count themselves among the former.[13] We see considerable

reason to join the majority.

---

[11] *See People v. Caballero*, 282 P.3d 291, 295 (Cal. 2012) (holding consecutive sentences totaling 110-years-to-life was *de facto* LWOP sentence under *Graham*); *State v. Ragland*, 836 N.W.2d 107, 121-22 (Iowa 2013) (holding a life sentence with parole eligibility after 60 years was a *de facto* LWOP sentence in violation of *Miller*); *Bear Cloud v. State*, 334 P.3d 132, 141-42 (Wyo. 2014) (holding consecutive sentences, including a life sentence for homicide, with parole eligibility after 45 years was *de facto* LWOP controlled by *Miller*); *Casiano v. Comm'r of Corr.,* 115 A.3d 1031, 1047-48 (Conn. 2015) (holding a juvenile's 50 year sentence without possibility of parole was a *de facto* LWOP sentence controlled by *Miller*); *Henry v. State*, 175 So.3d 675, 679-80 (Fla. 2015) (holding 90 year sentence for non-homicide juvenile defendant was unconstitutional under *Graham*); *State v. Boston*, 363 P.3d 453, 458 (Nev. 2015) (holding aggregate sentences for non-homicide offenses placing parole eligibility at 100 years are a *de facto* LWOP sentence in violation of *Graham*); *People v. Reyes*, 63 N.E.3d 884, 888 (Ill. 2016) (holding mandatory 97 year sentence with parole eligibility after 89 years is *de facto* LWOP and unconstitutional under *Miller*); *State ex rel. Morgan v. State*, 217 So.3d 266, 271 (La. 2016) ("We . . . construe the defendant's 99-year sentence as an effective life sentence, illegal under *Graham*."); *State v. Moore*, 76 N.E.3d 1127, 1140-41 (Ohio 2016) (holding consecutive terms-of-years sentences for non-homicide crimes with parole eligibility after 77 years is an unconstitutional *de facto* LWOP sentence under *Graham*); *State ex. rel Carr v. Wallace*, 527 S.W.3d 55, 63-64 (Mo. 2017) (holding mandatory concurrent sentences with parole eligibility after 50 years constituted a *de facto* LWOP sentence subject to *Miller*'s sentencing requirements); *Steilman v. Michael*, 407 P.3d 313, 319 (Mont. 2017) (holding *de facto* LWOP sentences are subject to constitutional protections of *Graham, Miller,* and *Montgomery*); *State v. Zuber*, 152 A.3d 197, 212 (N.J. 2017) (holding "lengthy term-of-years sentences that amount to life without parole" are controlled by *Graham* and *Miller*); *State v. Ramos*, 387 P.3d 650, 659 (Wash. 2017) (en banc) ("We now join the majority of jurisdictions that have considered the question and hold that *Miller* does apply to juvenile homicide offenders facing de facto life-without-parole sentences."); *Commonwealth v. Foust*, 180 A.3d 416, 431 (Pa. 2018) (holding a term-of-years sentence constituting a *de facto* LWOP sentence requires sentencing protections of *Miller*); *Carter v. State*, 192 A.3d 695, 735 (Md. 2018) (100-year aggregate punishment for non-homicide crimes with parole eligibility after 50 years was *de facto* LWOP sentence in violation of *Graham*); *Ira v. Janecka*, 419 P.3d 161, 167 (N.M. 2018) (holding *Roper*, *Graham*, and *Miller* applied to term-of-years sentences); *White v. Premo*, 443 P.3d 597, 604-05 (Or. 2019) (holding juvenile's 800-month sentence for murder with parole eligibility at 54 years was *de facto* LWOP sentence subject to *Miller* protections).

[12] Several state courts appear to have held that *de facto* LWOP sentences are not cognizable under any circumstances. *See State v. Kasic*, 265 P.3d 410, 414 (Ariz. Ct. App. 2011) (holding *Graham* inapplicable to term-of-years sentences); *Hobbs v. Turner*, 431 S.W.3d 283, 289 (Ark. 2014) (holding *Graham* and *Miller* do not apply to a "nonlife sentence"); *Lucero v. People*, 394 P.3d 1128, 1130 (Colo. 2017) (refusing to recognize *de facto* LWOP sentences in part because "[l]ife without parole is a specific sentence"); *Veal v. State*, 810 S.E.2d 127, 129 (Ga. 2018) (refusing to apply *Miller* and *Montgomery* to any sentences "other than LWOP"). Another state court appears to have ignored the argument outright. *See Diamond v. State*, 419 S.W.3d 435, 441 (Tex. Ct. App. 2012) (upholding a 99-year

We, like many states in that majority, decline to stand behind the simple formalism that a sufficiently lengthy term-of-years sentence cannot be a sentence of LWOP because it does not bear the name and terminates at a date certain. Rejection of the proposition is, first, a simple "matter of common sense . . . . Otherwise, the Eighth Amendment proscription against cruel and unusual punishment in the context of a juvenile offender could be circumvented simply by stating the sentence in numerical terms that exceed any reasonable life expectancy rather than labeling it a 'life' sentence." *Carter*, 192 A.3d at 725. As was noted in *Miller*, "[t]he Eighth

---

sentence imposed on a juvenile without discussing *Graham* despite counsel's argument raising the issue). At least two states seem to have suggested *de facto* LWOP sentences may exist but have yet to hold as such. *See State v. Quevedo*, 947 N.W.2d 402, ___ (S.D. 2020) ("[O]ur cases have seemed to suggest that a juvenile sentence involving a lengthy term of years and the lack of a meaningful opportunity for release could constitute a de facto life sentence and transgress *Graham*'s categorical Eighth Amendment prohibition on life without parole[.]" (citations omitted)); *Mason v. State*, 235 So.3d 129, 134 (Miss. 2017) (suggesting the defendant may have shown a *de facto* life sentence in violation of *Miller* and *Montgomery* had he presented evidence in support, but failure to do so and concession that his life expectancy would extend beyond parole eligibility defeated claim). Another grouping of states has elected not to afford relief under a *de facto* LWOP theory by declining to answer whether aggregated sentences and/or term-of-years sentences violate the Eighth Amendment absent a Supreme Court decision to that express effect. *See State v. Ali*, 895 N.W.2d 237, 246 (Minn. 2017) (declining to recognize aggregated term-of-years sentences as *de facto* LWOP sentences "absent further guidance from the [Supreme] Court" on both aggregation and recognition of *de facto* LWOP); *State v. Slocumb*, 827 S.E.2d 148, 152 (S.C. 2019) (recognizing that *de facto* LWOP punishments, whether as a single sentence or aggregated punishment, exist and may violate *Graham* and *Miller*, but declining to so hold "without further input from the Supreme Court"). Still another category has held that aggregated sentences cannot constitute a *de facto* LWOP sentence and resolved the defendants' appeals on that ground without affirmatively stating whether *de facto* LWOP sentences are otherwise cognizable. *See Martinez v. State*, 442 P.3d 154, 156-57 (Okla. Crim. App. 2019) (holding *Graham, Miller,* and *Montgomery* do not apply to aggregated sentences and concluding, without any discussion, that parole eligibility at age 79 offers a "meaningful opportunity to obtain release on parole during [the defendant's] lifetime"); *Vasquez v. Commonwealth,* 781 S.E.2d 920, 926 (Va. 2016) (declining to grant relief under *Graham* to aggregated term-of-years sentence without addressing single term-of-years sentences that exceed natural life).

[13] We note that, in *Slocumb*, the South Carolina Supreme Court stated that "jurisdictions around the country are approximately evenly split" on whether to recognize *de facto* LWOP sentences under *Graham* or *Miller*. 827 S.E.2d at 157 n. 17.

Amendment's prohibition of cruel and unusual punishment '*guarantees* individuals the right not to be subjected to excessive sanctions[,]' " 567 U.S. at 469, 183 L. Ed. 2d at 417 (emphasis added) (quoting *Roper*, 543 U.S. at 560, 161 L. Ed. 2d at 16), and allowing sentencers to so easily avoid its application would render it no guarantee at all. Any holding to the contrary ignores the fact that *Graham* and *Miller* declared cruel and unusual those punishments imposed against redeemable juveniles that deprive them of " 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " *Miller,* 567 U.S. at 479, 183 L. Ed. 2d at 424 (quoting *Graham*, 560 U.S. at 75, 176 L. Ed. 2d at 846). Stated differently, "[t]he court in *Graham* was not barring a terminology—'life without parole'—but rather a punishment that removes a juvenile from society without a meaningful chance to demonstrate rehabilitation and obtain release." *Moore*, 76 N.E.3d at 1139-40.

Many of the states that have declined to afford relief to juveniles sentenced to *de facto* LWOP sentences have refused to do so under the rationale that the Supreme Court's decisions in *Graham* and *Miller* were limited to the specific LWOP sentences considered in those cases. *See, e.g., Lucero*, 394 P.3d at 1132 ("*Graham* and *Miller* apply only where a juvenile is sentenced to the specific sentence of life without the possibility of parole for one offense." (citations omitted)). However, such holdings ignore *Graham*'s own caution against denying the true reality of the actual

punishment imposed on a juvenile when determining whether it violates the Eighth Amendment. In pointing out that adults and juveniles who receive the same sentence of LWOP do not, in fact, receive the same punishment, the majority in *Graham* stated "[a] 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only. *This reality cannot be ignored.*" 560 U.S. at 70-71, 176 L. Ed. 2d at 843 (emphasis added). To hold that the factual equivalent of the punishments prohibited by *Graham* and *Miller* is not actually prohibited by those decisions is to deny the factual reality. *Roper*, *Graham*, and *Miller* are all concerned with "imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller*, 567 U.S. at 472, 183 L. Ed. 2d at 419. A *de jure* LWOP sentence is certainly as "harsh" as its functional equivalent.

The straightforward applicability of *Graham*'s reasoning to *de facto* LWOP sentences is clear from the reasoning itself. Its observations about juveniles' immaturity, underdeveloped self-control, and capacity for change are true independent of any sentence. That those characteristics undermined the punitive justifications of LWOP is thus equally true of *de facto* LWOP sentences. *See Carter*, 192 A.3d at 726 ("The same [penological] test [from *Graham*] applied to a sentence of a lengthy term of years without eligibility for parole yields the same conclusion [as *Graham*]."). Retribution concerns must be measured against the culpability of defendants, and, because juveniles—"even when they commit terrible crimes"—are

inherently less culpable regardless of the sentence imposed, " 'the case for retribution is not as strong with a minor as with an adult.' " *Miller*, 567 U.S. at 472, 183 L. Ed. 2d at 419 (quoting *Graham*, 560 U.S. at 71, 176 L. Ed. 2d at 883). A *de facto* LWOP sentence is no more of a deterrent to a juvenile than its *de jure* equivalent because, in either case, "their immaturity, recklessness, and impetuosity[ ]make them less likely to consider potential punishment." *Id.* (citing *Graham*, 560 U.S. at 72, 176 L. Ed. 2d at 844). *De jure* and *de facto* LWOP sentences are also equally incapacitating; if incapacitation is inadequate to justify the former, *id.* at 472-73, 183 L. Ed. 2d at 419, then logic dictates it is inadequate for the latter. This same logic applies to rehabilitative concerns that are in irreconcilable conflict with LWOP sentences. *Id.* at 473, 183 L. Ed. 2d at 419-20. In sum, "none of what [*Graham*] said about children . . . is crime-specific. . . . So *Graham*'s reasoning implicates *any* life-without-parole sentence imposed on a juvenile[.]" *Id.* at 473, 183 L. Ed. 2d at 420 (emphasis added).

The other authorities relied upon by those state courts that do not recognize *de facto* LWOP challenges do not dissuade us of this holding. Several rely on language from Justice Alito's dissent in *Graham* for the proposition that it was a narrow decision. *See, e.g., Vasquez*, 781 S.E.2d at 925 (" 'Nothing in the Court's opinion [in *Graham*] affects the imposition of a sentence to a term of years without the possibility of parole.' " (quoting *Graham*, 560 U.S. at 124, 176 L. Ed. 2d at 877 (Alito, J., dissenting))). However, as other Supreme Court Justices have noted, a dissent from

a singular justice is not binding on the application of Supreme Court precedent. *Georgia v. Public.Resource.Org, Inc.*, ___ U.S. ___, ___, 206 L. Ed. 2d 732, 748 (2020) ("As every judge learns the hard way, 'comments in [a] dissenting opinion' about legal principles and precedents 'are just that: comments in a dissenting opinion.'" (quoting *Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 177 n. 10, 66 L. Ed. 2d 368, 377 n. 10 (1980)). *See also Moore*, 76 N.E.3d at 1157-58 (O'Connor, C.J., concurring) (observing Justice Alito's dissent in *Graham* is not controlling in the application of the majority's decision). Justice Thomas's observation in a footnote to his dissent in *Graham* that the majority did not include term-of-years sentences in calculating how many juveniles nationwide had been sentenced to life without parole is similarly unpersuasive. 560 U.S. at 113 n. 11, 176 L. Ed. 2d at 870 n. 11 (Thomas, J., dissenting). We note that a narrow reading of both *Roper* and *Graham* was expressly rejected in *Miller*; there, the Arkansas Supreme Court denied a defendant's Eighth Amendment challenge on the grounds that "*Roper* and *Graham* were 'narrowly tailored' to their contexts," and the Supreme Court reversed. 567 U.S. at 467, 183 L. Ed. 2d at 416. Our Supreme Court has also instructed this Court that we must "examine each of defendant's [Eighth Amendment and analogous state Constitution] contentions *in light of the general principles enunciated* by [the North Carolina Supreme] Court and the Supreme Court [of the United States] guiding cruel and unusual punishment analysis." *Green*, 348 N.C. at 603, 502 S.E.2d at 828 (emphasis

added).  The "general principles enunciated" in *Graham*, *Miller*, and *Montgomery* are, as explained above, applicable to *de facto* LWOP sentences even if the specific facts of those decisions did not involve them.

Those states in the minority of jurisdictions have likewise relied on federal court decisions holding *Graham* and *Miller* do not apply to term-of-years sentences. *See, e.g., Vasquez*, 781 S.E.2d at 926 (relying on *Bunch v. Smith*, 685 F.3d 546 (6th. Cir. 2012)).  *Bunch*, however, dealt with *Graham* in a specific context: whether, under the deferential standard of collateral habeas review applicable to the Antiterrorism and Effective Death Penalty Act of 1996, an Ohio court[14] that sentenced a defendant to a lengthy term-of-years sentence acted contrary to "clearly established federal law."  685 F.3d at 549.  That standard presents a markedly different legal question than the one considered here.  *See Atkins v. Crowell*, 945 F.3d 476, 480 (6th Cir. 2019) (Cole, C.J., concurring) (noting that *Miller* and *Graham* compelled the conclusion that a *de facto* LWOP sentence was unconstitutional but denying habeas relief because "[o]n occasion, AEDPA's onerous standards require us to deny . . . relief even though the sentence . . . is unconstitutional").

## 2.  Aggregate Sentences As *De Facto* LWOP Sentences

---

[14] Ohio's highest court later recognized *de facto* LWOP sentences imposed on juveniles as violative of the Eighth Amendment in an appeal brought by Bunch's codefendant.  *Moore*, 76 N.E.3d at 1139.

Having held that *de facto* LWOP sentences for redeemable juveniles are unconstitutional under *Graham, Miller,* and *Montgomery*, we next address whether an *aggregate* punishment of concurrent sentences may amount to that unlawful punishment. Again, state courts are sharply divided on the issue. Some states that recognize *de facto* LWOP sentences do so only when imposed as a single sentence.[15] Others who have rejected recognition of *de facto* LWOP sentences have done so on the ground that aggregated sentences do not present such a circumstance.[16] However, a majority of courts again favor recognition of aggregated sentences as *de facto* LWOP punishments subject to *Graham, Miller,* and *Montgomery*.[17]

We also hold that aggregated sentences may give rise to a *de facto* LWOP punishment. As other courts have observed, "[n]owhere in the *Graham* decision does the Supreme Court specifically limit its holding to offenders who were convicted for a *single* nonhomicide offense[.]" *Boston*, 363 P.3d at 457. That decision granted Eighth Amendment protection to a juvenile irrespective of his numerous offenses:

> [O]ne cannot dispute that this defendant posed an immediate risk, for he had committed, we can assume, *serious crimes* early in his term of supervised release and

---

[15] *See State v. Brown*, 118 So.3d 332, 342 (La. 2013) (holding *Graham* does not apply to multiple term-of-years sentences leading to release at age 86); *Willbanks v. Dep't of Corr.*, 522 S.W.3d 238, 246 (Mo. 2017) (en banc) (declining to extend *de facto* LWOP recognition to aggregated term-of-years sentences); *Foust*, 180 A.3d at 434 (same).

[16] *Martinez*, 442 P.3d at 156-57; *Vasquez*, 781 S.E.2d at 926; *Ali*, 895 N.W.2d at 246.

[17] Reviewing cases from those jurisdictions cited *supra* nn. 11-12, we identify 11 states that have rejected aggregation and 13 that have recognized it. Maryland's highest court's observation that "[m]ost of the decisions in other jurisdictions applying *Graham* and *Miller* to sentences expressed in a term of years have actually involved stacked sentences" still appears true. *Carter*, 192 A.3d at 732-33.

> despite his own assurances of reform. Graham deserved to be separated from society for some time in order to prevent what the trial court described as an *"escalating pattern of criminal conduct,"* but it does not follow that he would be a risk to society for the rest of his life.

*Graham*, 560 U.S. at 73, 176 L. Ed. 2d at 844 (emphasis added) (citation omitted). As for *Miller*, one of the appellants in that case was also convicted of two felonies, with no apparent impact on the ultimate holding. 567 U.S. at 466, 183 L. Ed. 2d at 415.

The applicability and scope of protection found in the Eighth Amendment under both decisions turned on the identity of the defendant, *not* on the crimes perpetrated. *Graham*, which followed the categorical approach used in *Roper* to invalidate death penalties against minors, noted that such categorical cases "turn[] on the characteristics of the offender[.]" 560 U.S. at 61, 176 L. Ed. at 837. Although *Graham* itself stated that "the age of the offender and the nature of the crime each bear on the analysis[,]" 560 U.S. at 69, 176 L. Ed. 2d at 842, the identity of the offender as a juvenile was of primary importance as recognized in *Miller* and *Montgomery*: "The 'foundation stone' for *Miller*'s analysis was this Court's line of precedent holding certain punishments disproportionate *when applied to juveniles*. . . . *Miller* took as its starting premise the principle established in *Roper* and *Graham* that 'children are constitutionally different from adults for purposes of sentencing.'" *Montgomery*, ___ U.S. at ___, 193 L. Ed. 2d at 618 (emphasis added) (citations omitted). *Miller* appropriately recognized that "none of what [*Graham*] said

about children . . . is crime-specific. Those features are evident in the same way, and to the same degree, when (as in both cases here) a botched robbery turns into a killing. So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile[.]" 567 U.S. at 473, 183 L. Ed. 2d at 420. That is, the categorical prohibition is principally focused on the offender, not on the crime or crimes committed.

The states that have not recognized aggregate punishments as *de facto* LWOP sentences have done so on grounds that we hold distinguishable. For example, Pennsylvania rejected the argument on the basis that its caselaw "has long disavowed the concept of volume discounts for committing multiple crimes." *Foust*, 180 A.3d at 436. North Carolina law is not so averse. To be sure, our Supreme Court has held that "[t]he imposition of consecutive life sentences, standing alone, does not constitute cruel or unusual punishment. A defendant may be convicted of and sentenced for each specific act which he commits." *State v. Ysaguire*, 309 N.C. 780, 786, 309 S.E.2d 436, 441 (1983) (citations omitted). However, such consecutive sentences are not "standing alone" when they also involve a juvenile defendant. *Cf. Graham*, 560 U.S. at 70-71, 176 L. Ed. 2d at 843 ("A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only. This reality cannot be ignored." (citations and quotations omitted)). We note our own caselaw and statutes compel the State to consider consecutive sentences as a single punishment. *See* N.C. Gen. Stat. 15A-1354(b) (2019) ("In determining the effect of consecutive

sentences . . . , the Division of Adult Correction and Juvenile Justice of the Department of Public Safety must treat the defendant as though he has been committed for a single term[.]"); *Robbins*, 127 N.C. App. at 165, 487 S.E.2d at 773 (holding parole eligibility for consecutive sentences must be calculated as if serving a single term).

Other states have found persuasive the following non-binding *dicta* from the Supreme Court's decision in *O'Neil v. Vermont*: " [']It would scarcely be competent for a person to assail the constitutionality of the statute prescribing a punishment for burglary, on the ground that he had committed so many burglaries that, if punishment for each were inflicted on him, he might be kept in prison for life.['] " 144 U.S. 323, 331, 36 L. Ed. 450, 455 (1892) (quoting the Vermont Supreme Court). We do not deem this language adequate to counter *Roper, Graham, Miller*, and *Montgomery*; needless to say, *O'Neil* did not involve juveniles, and long predated the express adoption of categorical Eighth Amendment prohibitions in juvenile cases that primarily focus not on the crimes committed but instead "turn[] on the characteristics of the offender." *Graham*, 560 U.S. at 61, 176 L. Ed. 2d at 837; *see also Moore*, 76 N.E.3d at 1142 ("Whether the sentence is the product of a discrete offense or multiple offenses, the fact remains that it was a *juvenile* who committed the one offense or several offenses and who has diminished moral culpability." (emphasis in original)).

In short, "*O'Neil* . . . does not indicate anything about the Supreme Court's view on the matter." *Ira*, 419 P.3d at 166.

### 3. Defendant's Sentences Are an Unconstitutional *De Facto* LWOP Punishment

The final question posed by Defendant's argument is whether his consecutive sentences, which place his eligibility for parole at 50 years and earliest possible release at age 67, are sufficiently lengthy to constitute an unconstitutional *de facto* LWOP punishment in light of the trial court's determination that he is neither irredeemable nor irreparably corrupt. Though the issue of identifying *de facto* LWOP sentences certainly presents some practical challenges, we hold that Defendant's consecutive sentences of life and parole eligibility at 50 years constitute a *de facto* LWOP punishment.

Several courts have held *de facto* LWOP sentences that do not conclusively extend beyond the juvenile's natural life are nonetheless unconstitutional sentences, and many of them have found such sentences to exist when release (either through completion of the sentence or opportunity for parole) is only available after roughly 50 years, and sometimes less.[18] Those states have adopted differing methods for their

---

[18] *See Zuber*, 152 A.3d at 212-13 (55 years); *State ex rel. Carr*, 527 S.W.3d at 57 (50 years); *People v. Contreras*, 411 P.3d 445, 446 (Cal. 2018) (50 years); *Carter*, 192 A.3d at 734 (50 years); *Casiano*, 115 A.3d at 1035 (50 years); *Bear Cloud*, 334 P.3d at 136 (45 years); *People v. Buffer*, 137 N.E.3d 763, 774 (Ill. 2019) (40 years). Courts that have not identified an exact point at which a *de facto* LWOP sentence arises have indicated that 50 years is close to the limit. *See, e.g., Ira*, 419 P.3d at 170 ("Certainly the fact that Ira will serve almost 46 years before he is given an opportunity to obtain

delineations, *see Carter*, 192 A.3d at 727-28 (surveying decisions and identifying five different means). Though the State rightly points out that the task of demarcating the bounds of a *de facto* LWOP sentence may be difficult, the task is not impossible.

For example, retirement age has been used to discern whether a sentence is a *de facto* LWOP punishment. *Id.* at 734. North Carolina's Constitution provides that persons' "inalienable rights" include the "enjoyment of the fruits of their own labor," N.C. Const. Art. I, § 1, and our Supreme Court has recognized that "a law which destroys the opportunity of a man or woman to earn a living in one of the ordinary harmless occupations of life . . . is legal grotesquery." *State v. Harris*, 216 N.C. 746, 759, 6 S.E.2d 854, 863 (1940). It is difficult, then, to deny that incarcerating a juvenile with no hope for release until or after the point at which society no longer considers them an ordinary member of the workforce seems to run afoul of the "hope for some years of life outside prison walls" required by *Graham* and *Miller*. *Montgomery*, ___ U.S. at ___, 193 L. Ed. 2d at 623. Stated differently:

> [T]he language of *Graham* suggests that the high court
> envisioned more than the mere act of release or a de
> minimis quantum of time outside of prison. *Graham* spoke
> of the chance to rejoin society in qualitative terms—"the
> rehabilitative ideal" ([*Graham*] at 130 S. Ct. 2011)—that
> contemplate a sufficient period to achieve reintegration as
> a productive and respected member of the citizenry. The

---

release is the outer limit of what is constitutionally acceptable." (citation omitted)). The 50-year mark identified by several courts "seems consistent with the observation of the *Graham* Court that the defendant in that case would not be released 'even if he spends the next half century attempting to atone for his crimes and learn from his mistakes.'" *Carter*, 192 A.3d at 728-29 (quoting *Graham*, 560 U.S. at 79, 176 L. Ed. 2d at 848).

> "chance for reconciliation with society" (id. at 130 S. Ct. 2011), "the right to reenter the community" (id. at 130 S. Ct. 2011), and the opportunity to reclaim one's "value and place in society" (*ibid.*) all indicate concern for a measure of belonging and redemption that goes beyond mere freedom from confinement. . . . Confinement with no possibility of release until age 66 or age 74 seems unlikely to allow for the reintegration that *Graham* contemplates.

*Contreras*, 411 P.3d at 454. To release an individual after their opportunity to directly contribute to society—both through a career and in other respects, like raising a family—"does not provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation' required to obtain release and reenter society as required by *Graham*." *Null*, 836 N.W.2d at 71 (quoting *Graham*, 560 U.S. at 74, 176 L. Ed. 2d at 845-46). Lastly, we observe that our General Assembly has elsewhere defined what an appropriate life with parole sentence in compliance with *Miller* looks like; N.C. Gen. Stat. § 15A-1340.19A (2019), the statute enacted for that purpose, provides that " 'life imprisonment with parole' shall mean that the defendant shall serve a minimum of 25 years imprisonment prior to becoming eligible for parole."[19]

---

[19] Defendant asserted at oral argument, that, as a matter of statutory construction, juveniles sentenced to first-degree murder under N.C. Gen. Stat. § 15A-1340.19A, *et seq.* must be given parole eligibility at 25 years. Defendant never raised the issue before the trial court, nor did he brief any statutory interpretation arguments; any arguments as to the purported construction and interpretation of N.C. Gen. Stat. § 15A-1340.19A, *et seq.* have not been presented in this appeal. *See* N.C. R. App. P. 28(a) (2020) ("Issues not presented and discussed in a party's brief are deemed abandoned."). We therefore do not address the statutory construction of N.C. Gen. Stat. § 15A-1340.19A and instead look to it as an expression of the General Assembly's judgment on what constitutes a constitutionally permissible juvenile life sentence following *Miller*—an issue that *was* expressly argued and addressed by the parties in their briefs.

A holding that Defendant's sentences constitute a *de facto* LWOP sentence is in line with the above; his ineligibility for parole for 50 years falls at the limit identified by numerous other jurisdictions as constituting an unconstitutional *de facto* LWOP sentence, and it affords him release only at or after retirement age. *See United States v. Grant*, 887 F.3d 131, 151 (surveying various means of calculating retirement age and observing "by all accounts, the national age of retirement to date is between sixty-two and sixty-seven inclusive"), *reh'g en banc granted, opinion vacated*, 905 F.3d 285 (3rd Cir. 2018).

As far as identifying what a sentence that would *not* amount to a *de facto* LWOP punishment, our General Assembly has offered some indication. *See* N.C. Gen. Stat. § 15A-1340.19A. The definition provided therein is not strictly limited to single offenses: "If the sole basis for conviction of a count or *each count* of first degree murder was the felony murder rule, then the court shall sentence the defendant to life imprisonment with parole." N.C. Gen. Stat. § 15A-1340.19B(a)(1) (2019). Defendant here has clearly abandoned any assertion that he was convicted under the felony murder rule. But N.C. Gen. Stat. § 15A-1340.19B(a)(1) nonetheless indicates that our General Assembly has determined parole eligibility at 25 years for multiple offenses sanctionable by life with parole is not so excessive as to run afoul of *Miller*. *See, e.g., Ramos*, 387 P.3d at 661-62 (noting that "[s]tate legislatures are . . . allowed some flexibility in fashioning the methods for fulfilling *Miller*'s substantive

requirements, so long as the State's approach does not 'demean the substantive character of the federal right at issue.' " (quoting *Montgomery*, ___ U.S. at ___, 193 L. Ed. 2d at 621)). This Court has twice held that life with the possibility of parole after 25 years does not constitute a *de facto* LWOP sentence subject to *Miller*. *See State v. Jefferson*, 252 N.C. App. 174, 181, 798 S.E.2d 121, 125 (2017) ("Defendant's sentence is neither an explicit nor a *de facto* term of life imprisonment without parole. Upon serving twenty-five years of his sentence, Defendant will become eligible for parole[.]"); *State v. Seam*, 263 N.C. App. 355, 361, 823 S.E.2d 605, 609-10 (2018) (holding *Miller*'s individualized sentencing requirement inapplicable to a single sentence of felony murder carrying mandatory punishment of life imprisonment with the opportunity for parole after 25 years), *aff'd per curiam*, 373 N.C. 529, 837 S.E.2d 870 (2020).

We stress, as the Supreme Court did in *Graham*, that nothing in our decision compels the State to actually release Defendant after 25 years. The Post-Release Supervision and Parole Commission will ultimately decide whether Defendant may be released in his lifetime. Our decision simply upholds the Eighth Amendment's constitutional requirement that Defendant, as a juvenile who is neither incorrigible nor irredeemable, have his "hope for some years of life outside prison walls . . . restored." *Montgomery*, ___ U.S. at ___, 193 L. Ed. 2d at 623.

## III.  <u>CONCLUSION</u>

The facts, the law, and all that results in this appeal are difficult. As shown by the victim impact statements offered at resentencing, the murders of Mr. Carpenter and Ms. Helton—two teenagers who were soon to be parents—caused irreparable loss and irrevocable harm to victims and their families. Defendant was shaped by what was a profoundly troubled childhood, leading him to actively participate in these truly heinous crimes. These facts have led this Court in reviewing Defendant's constitutional claims that have divided courts nationwide, to discuss the difficult subject of sentencing, for outrageous acts, a juvenile offender who is inherently less culpable than adults and was found by the trial court to be redeemable. "Few, perhaps no, judicial responsibilities are more difficult than sentencing." *Graham*, 560 U.S. at 77, 176 L. Ed. 2d at 847. This case is certainly no exception, as the trial court explained following resentencing: "[T]hese are real tragedies. . . . [T]hey don't put [you] in positions like this because you're weak or because you're a coward. If you can't, you know, make hard decisions, you will never last as a judge and you will never last as a prosecutor or a defense lawyer." Indeed, when it comes to sentencing juveniles for the most egregious crimes, these difficulties are heightened; in such circumstances, the (in)humanity of the perpetrator, the victims, the crimes, and the punishment are inseparable under the Eighth Amendment.

This Court's duty is to uphold the federal and state Constitutions irrespective of these difficulties. In determining Defendant's appeal, we hold under Eighth Amendment jurisprudence: (1) *de facto* LWOP sentences imposed on juveniles may run afoul of the Eighth Amendment; (2) such punishments may arise out of aggregated sentences; and (3) a sentence that provides no opportunity for release for 50 or more years is cognizable as a *de facto* LWOP sentence. Consistent with the Eighth Amendment as interpreted by *Roper, Graham, Miller,* and *Montgomery*, these holdings compel us to reverse and remand Defendant's sentence. Under different circumstances, we would leave resentencing to the sound discretion of the trial court. *See, e.g., State v. Nunez*, 204 N.C. App. 164, 170, 693 S.E.2d 223, 227 (2010) (remanding for resentencing and noting that, on remand, "[w]hether the two sentences should run concurrently or consecutively rests in the discretion of the trial court"). Here, however, we hold that of the two binary options available—consecutive or concurrent sentences of life with parole—one is unconstitutional. We therefore instruct the trial court on remand to enter two concurrent sentences of life with parole as the only constitutionally permissible sentence available under the facts presented.

REVERSED AND REMANDED.

Judges BRYANT and HAMPSON concur.